*Carlos Couret-Rios v. Fire & Police Employees' Retirement System of the City of Baltimore*, No. 36, September Term, 2019. Opinion by Getty, J.

**LOCAL CODES—DISABILITY RETIREMENT SYSTEMS**

Under the Baltimore City Fire and Police Employees' Retirement System compensation statute, Balt. City Code, Art. 22, §§ 29–49, qualified employees are potentially eligible for two different levels of disability benefits: a less substantial non-line-of-duty ("NLOD") level of benefits; or a more substantial line-of-duty ("LOD") level of benefits. Qualified employees are only eligible for LOD benefits if their disability stems from an injury that occurred in the line of duty and the injury caused a permanent "physical incapacity." In contrast, qualified employees are eligible for NLOD benefits if the injury caused a permanent "mental[] *or* physical[] incapacit[y]" that prevents the employee from performing their job duties, whether or not the injury occurred in the line of duty.

The Court of Appeals held that, for the purposes of the Baltimore City Fire and Police Employees' Retirement System compensation statute, a "physical incapacity" may include, in certain circumstances, manifestations of a "physical incapacity" that are caused by a physical injury to the brain. Petitioner, a qualified employee, was entitled to LOD retirement benefits where he suffered a concussion in the course of his duties, and as a result of the brain injury, he suffered permanently disabling memory loss and attention deficits.

Circuit Court for Baltimore City
Case No. 24-C-17-004254
Argued: December 10, 2019

IN THE COURT OF APPEALS

OF MARYLAND

No. 36

September Term, 2019

_____

CARLOS COURET-RIOS

v.

FIRE & POLICE EMPLOYEES'
RETIREMENT SYSTEM OF THE CITY
OF BALTIMORE

_____

Barbera, C.J.
McDonald,
Watts,
Hotten,
Getty,
Booth,
Adkins, Sally D.,
(Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Getty, J.

_____

Filed: May 1, 2020

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Under the Fire and Police Employees' Retirement System (the "F&P Retirement System" or "F&P") compensation statute, police officers are potentially eligible for two different levels of disability benefits: a less substantial non-line-of-duty ("NLOD") level of benefits; or a more substantial line-of-duty ("LOD") level of benefits. *See* Balt. City Code, Art. 22, § 34. Officers are only eligible for LOD benefits if their disability stems from an injury that occurred in the line of duty and the injury caused a permanent "physical incapacity." *See id.* §§ 33(*l*)(4)(iii); 33(*l*)(11)(ii)(A). In contrast, officers are eligible for NLOD benefits if the injury caused a permanent "mental[] *or* physical[] incapacit[y]" that prevents the officer from performing their job duties, whether or not the injury occurred in the line of duty. *See id.* §§ 34(c)(1) (emphasis added). In other words, benefits for NLOD disability may be awarded on the basis of a mental or physical incapacity, but benefits for LOD disability can only be awarded based on a physical incapacity.

Petitioner Carlos Couret-Rios suffered a concussion in the course of his duties as a Baltimore City police officer. As a result of the brain injury, Officer Couret-Rios suffers from memory loss and attention deficits. Officer Couret-Rios filed for and was granted LOD disability benefits after a hearing examiner concluded that Officer Couret-Rios was permanently physically incapacitated. The Circuit Court for Baltimore City affirmed, but the Court of Special Appeals reversed, holding that Officer Couret-Rios's incapacities were mental, rather than physical.

We must now determine if the hearing examiner erred when she awarded LOD disability benefits based on a finding of fact that Officer Couret-Rios suffered from memory loss and attention deficits as a result of a mild traumatic brain injury. For the

reasons that follow, we disagree with the Court of Special Appeals and hold that the hearing examiner did not err in granting LOD retirement benefits.

## BACKGROUND

### A.    *The F&P Retirement Compensation Statute.*

The F&P Retirement System is a benefit system statutorily established to provide retirement allowances and death benefits to firefighters and police officers ("Members") paid by the Mayor & City Council of Baltimore (the "City").  *See* Balt. City Code, Art. 22, §§ 29–49.  The F&P statute prescribes contributions from the Members and the City to fund the Retirement System, which is managed by a Board of Trustees that has a fiduciary duty to act in the best interests of the Members.  Through the rules established by the statute and the procedures established by the Board of Trustees, the Retirement System pursues the goals of providing life-long benefits to retired and disabled Members and ensures that the System remains solvent so that each Member can draw benefits when needed.

The statute establishes two different levels of disability benefits for the Members of the F&P Retirement System: a less substantial NLOD level of benefits; and a more substantial LOD level of benefits.  *See* Balt. City Code, Art. 22, § 34.  Members are only eligible for LOD benefits if their disability stems from an injury that occurred in the line of duty *and* the injury caused a permanent "physical incapacity."  *See id.* §§ 33(*l*)(4)(iii); 33(*l*)(11)(ii)(A).  In contrast, Members are eligible for NLOD benefits if the injury caused a permanent "mental[] *or* physical[] incapacit[y]" that prevents the Member from performing their job duties, whether or not the injury occurred in the line of duty.  *See id.* §§ 34(c)(1) (emphasis added).  In other words, benefits for NLOD disability may be

2

awarded on the basis of a mental or physical incapacity, but benefits for LOD disability can only be awarded based on a physical incapacity. *See Bd. of Trs. of Fire & Police Emps.' Ret. Sys. of Balt. v. Kielczewski*, 77 Md. App. 581, 591–93 (1989).

The dispute in this case is not whether Officer Couret-Rios should receive disability retirement benefits but how substantial those benefits are allowed to be under the F&P retirement compensation statute. To demonstrate the benefit dichotomy, we begin with the language of the statute. The first pertinent portion of the statute is § 33(*l*):

> (*l*) *Panel of hearing examiners.*
>
> > (1) There is a panel of hearing examiners, composed of persons with a demonstrated knowledge and competence in disability claims evaluation. . . .
> >
> > \* \* \*
> >
> > (4) (i) Any non-line-of-duty disability or line-of-duty disability claimant must apply to the Board of Trustees.
> >
> > > (ii) The application must include a medical certification of disability and all supporting medical documentation, on a form prescribed by the Board of Trustees, in which the member must state that she or he has suffered a disability and that the disability prevents her or him from further performance of the duties of her or his job classification.
> > >
> > > (iii) If the claim is for a line-of-duty disability benefit, the member must also state that the physical incapacity was the result of an injury arising out of and in the course of the actual performance of her or his duty, without willful negligence on her or his part.
> > >
> > > (iv) Any member who has joined this system on or after July 1, 1979, and who applies for a line-of-duty disability benefit must also state that the disability resulted from an injury that occurred within 5 years of the date of her or his application.
> >
> > \* \* \*
> >
> > (7) A hearing examiner shall conduct hearings on all matters involving non-line-of-duty disability claims, line-of-duty disability claims, . . . and any related matters arising out of these claims. . . .

* * *

(10) (i) At the hearing, the member has the burden of proving, by a preponderance of the evidence:

> (A) the nature and extent of his or her disability; and

> (B) that the disability prevents him or her from the further performance of the duties of his or her job classification.

(ii) If the matter involves a line-of-duty disability claim, the member has the burden of proving by a preponderance of the evidence that the disability was the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on the member's part.

* * *

(11) The hearing examiner shall determine the following:

(i) whether the member has suffered an injury or illness of such a nature as to preclude the member from the further performance of the duties of his or her job classification;

(ii) if the claim is for line-of-duty disability benefits:

> (A) whether the physical incapacity is the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on the member's part;

> (B) whether the disability qualifies under § 34(e) . . . .

> (C) for a member who joined this system on or after July 1, 1979, whether the disability resulted from an injury that occurred within 5 years before the date of the members' application . . . .

* * *

(12) The hearing examiner shall issue written findings of fact that set forth the reasons for the hearing examiner's determination. If either party to the hearing is aggrieved by the hearing examiner's determination, that party may seek judicial review of the determination by the Circuit Court for Baltimore City. The review shall be sought and heard as provided for in the Maryland Rules, with the exception that the review shall be heard on the record only, on a right-of-way basis. The final determination of the hearing examiner is presumptively correct and may not be disturbed on review except when arbitrary, illegal, capricious, or discriminatory. A party to the

4

judicial review may appeal the court's final judgment to the Court of Special Appeals in accordance with the Maryland Rules of Procedure.

In large part, § 33(*l*) provides the procedures for administrative hearings. At the outset, disability claimants must apply to the Board of Trustees. *Id.* § 33(*l*)(4)(i). The application must include: (1) medical certification of disability and all supporting medical documentation, stating, among other things, that the disability prevents the claimant from further performance of their duties; and (2) for LOD claims, a statement that (i) "the *physical incapacity* was the result of an injury arising out of and in the course of the actual performance of her or his duty, without willful negligence on her or his part"; and (ii) "the disability resulted from an injury that occurred within 5 years of the date of her or his application." *Id.* § 33(*l*)(4)(ii)–(iv) (emphasis added).

On receipt of an application, the claimant must be medically examined by a physician selected by the Board of Trustees. *Id.* § 33(*l*)(5). A panel of hearing examiners then schedule a hearing during which one of the hearing examiners conducts an informal hearing (i.e., without strict compliance of the rules of evidence) that includes testimony and the production of documents. *Id.* § 33(*l*)(6)–(8). Despite the informality, the hearings are adversarial—the City Solicitor's office represents the Board of Trustees and the claimant has the right to counsel. *Id.* § 33(*l*)(9).

At the hearing, the claimant has the burden of proving, by a preponderance of the evidence: (1) "the nature and extent of his or her disability"; and (2) "that the disability prevents him or her from the further performance of the duties of his or her job classification." *Id.* § 33(*l*)(10)(i). For LOD claims, the claimant must also prove "by a

5

preponderance of the evidence that the disability was the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on the [claimant's] part." *Id.* § 33(*l*)(10)(ii).

The hearing examiner must then determine "whether the [claimant] has suffered an injury or illness of such a nature as to preclude the [claimant] from the further performance of the duties of his or her job classification"; and if the claim is for LOD benefits, whether (1) "the physical incapacity" is the result of a line-of-duty injury, "without willful negligence on the [claimant's] part"; (2) "the disability qualifies under § 34(e)"; and (3) "the disability resulted from an injury that occurred within 5 years before the date of the [claimant's] application." *Id.* § 33(*l*)(11)(i)–(ii). The hearing examiner must then "issue written findings of fact that set forth the reasons for the hearing examiner's determination."[1] *Id.* § 33(*l*)(12).

Section 34(c) and (e-1), the more substantive provisions, largely serve to define the eligibility and benefits of both NLOD and LOD disability retirement:

> (c) *Non-line-of-duty disability retirement benefit.*
>
>> (1) *Eligibility requirements*. A member shall be retired on a non-line-of-duty disability retirement if:
>>
>>> (i) the member has acquired at least 5 years of service, as determined by the Board of Trustees; and

---

[1] Section 33(*l*) also defines the appellate rights of the claimant and the City—namely, either party may seek judicial review by the Circuit Court for Baltimore City and then may appeal that judgment to the Court of Special Appeals. Balt. City Code, Art. 22, § 33(*l*)(12). However, "[i]f neither party seeks judicial review within 30 days following the mailing of the hearing examiner's written findings of fact, the hearing examiner's determination is final and binding, subject to the panel of hearing examiners' right to reexamination." *Id.* § 33(*l*)(14).

6

(ii) a hearing examiner determines that:

> (A) the member is mentally or physically incapacitated for the further performance of the duties of the member's job classification in the employ of Baltimore City; and

> (B) the incapacity is likely to be permanent.

* * *

(e-1) *Line-of-duty disability benefits.*

> (1) A member shall be retired on a line-of-duty disability retirement if:

>> (i) a hearing examiner determines that the member is totally and permanently incapacitated for the further performance of the duties of his or her job classification in the employ of Baltimore City, as the result of an injury arising out of and in the course of the actual performance of duty, without willful negligence on his or her part; and

>> (ii) for any employee who became a member on or after July 1, 1979, the application for line-of-duty disability benefits is filed within 5 years of the date of the member's injury.

Section 34 also provides detailed allowances for each type of disability retirement. The details are not pertinent, but in sum, LOD allowances are significantly more substantial than NLOD allowances. *Compare id.* § 34(e-2), *with id.* § 34(d). To be eligible for NLOD disability retirement benefits, a claimant must have acquired at least five years of service and a hearing examiner must determine that (1) "the [claimant] is *mentally or physically* incapacitated for the further performance" of their job; and (2) "the incapacity is likely to be permanent." *Id.* § 34(c)(1) (emphasis added).

Assuming that the application for LOD benefits is filed within five years of the date of injury, a claimant is eligible for LOD disability retirement benefits if a hearing examiner determines that the claimant is (1) "totally and permanently incapacitated for the further

7

performance" of his or her job; (2) "as the result of an injury" in the line of duty; (3) "without willful negligence on his or her part." *Id.* § 34(e-1)(1).

Despite some inconsistent and duplicative language across two long provisions, the statute, on its face, provides for two separate types of disability retirement benefits, as made clear by the Court of Special Appeals in *Board of Trustees of Fire & Police Employees' Retirement System of the City of Baltimore v. Kielczewski*, 77 Md. App. 581 (1989). In *Kielczewski*, the intermediate appellate court held that "the disability retirement benefit scheme contemplates the allegation and proof of a physical incapacitation as a prerequisite to the award of [LOD] disability retirement benefits." *Id.* at 592–93. The court based its holding on the statutory language of §§ 33 and 34:[2]

> It is evident that the purpose underlying these sections is the enumeration of the substantive requirements of the two disability retirement benefits options available to an employee and to set out the procedures whereby that employee's entitlement to one or the other is to be determined. Section 34(c) and (e[-1]) prescribe the requirements of the disability which qualifies an employee for either [a NLOD] or [LOD] disability retirement. They do so in terms of the level of disability, i.e., that the employee must be "incapacitated." Only § 34(c) additionally prescribes the nature of the disability, i.e., that it may be mental or physical. . . .
>
> * * *
>
> Section 33(*l*), with its requirements that a [LOD] disability retirement claimant allege a physical incapacity and that the hearing examiner make determinations concerning that physical incapacity, must be read together with § 34(e[-1]), which describes only the level of the disability required for [LOD] disability retirement benefits and § 34(c), which describes, as to [NLOD] disability retirement benefits, both the nature and the level of the disability required. So read, it becomes patent that . . . § 33(*l*) gives content

---

[2] The relevant provisions of the statute remain substantively the same as they were in 1989 except a nomenclature change from "Special" benefits to "Line-of-Duty" benefits and "Ordinary" benefits to "Non-Line-of-Duty" benefits.

to § 34(e) insofar as the nature of the disability required as a prerequisite to the award of [LOD] disability retirement benefits is concerned. Construing these provisions any other way would read these requirements out of § 33(*l*).

*Id.* at 591–92.

## B.    *The Accident & Subsequent Injuries.*

This case stems from an application for LOD disability benefits filed by Officer Carlos Couret-Rios after he was injured in an automobile accident that occurred during his afternoon shift with the Baltimore City Police Department. At the time of the accident, Officer Couret-Rios was 41 years old and had served as a police officer with the Department for eight years. The facts of the automobile accident are undisputed.

Officer Couret-Rios was on duty on August 12, 2014 when a vehicle rear-ended the departmental vehicle in which he was sitting. Officer Couret-Rios briefly lost consciousness when his head snapped forward and back. He was taken to an emergency room where he complained of neck pain, blurry vision, nausea, and dizziness. He was discharged with a diagnosis of a concussion and cervical strain. For all relevant times after the accident, Officer Couret-Rios was removed from full duty and placed on light duty status.

Over the next several months, Officer Couret-Rios received treatment for neck and upper-back pain, headaches, and nausea. He also complained of a tremor in his left hand, an unsteady gait, a reduction in his rate of cognition, and irritability. The treating physicians diagnosed Officer Couret-Rios with benign positional vertigo[3] and post-

---

[3] "Benign positional vertigo," which is also known as "benign paroxysmal positional vertigo," is "a condition marked by short, recurrent episodes of vertigo and nystagmus

concussion syndrome.  The physicians also prescribed physical therapy to improve Officer Couret-Rios's balance and reduce the problems related to dizziness.

By October 23, 2014, two months after the accident, the officer's back pain was resolved as evidenced by the medical records at that time.  For the next several months, he continued treatment with a physical therapist.  By the time he was discharged from physical therapy on January 2, 2015, Officer Couret-Rios had no symptoms of vertigo or dizziness and suffered from only an occasional mild headache.  In fact, his physical condition had improved to allow his return to a full exercise program.

Officer Couret-Rios first complained of short-term memory loss on December 11, 2014, four months after the initial injury.  At a doctor's appointment on that date, Officer Couret-Rios recounted that sometime within the last month he was suspended from duty because he misplaced his service firearm—an error that he attributed to his memory issues. In connection with his memory issues, Officer Couret-Rios was referred for neuropsychological testing.

---

brought about by a change in head position."  *Benign Paroxysmal Positional Vertigo*, Merriam-Webster, https://www.merriam-webster.com/dictionary/benign%20paroxysmal%20positional%20vertigo (last visited April 30, 2020), archived at https://perma.cc/ZF2M-PEV9.  "Vertigo" is "a sensation of motion in which the individual or the individual's surroundings seem to whirl dizzily." *Vertigo*, Merriam-Webster, https://www.merriam-webster.com/dictionary/vertigo (last visited April 30, 2020), archived at https://perma.cc/YZZ8-XZ6L.  "Nystagmus" is the "involuntary usually rapid movement of the eyeballs occurring normally with dizziness during and after bodily rotation or abnormally following head injury or as a symptom of disease."  *Nystagmus*, Merriam-Webster, https://www.merriam-webster.com/dictionary/nystagmus (last visited April 30, 2020), archived at https://perma.cc/AP6K-JFLB.

After testing, Dr. Melissa Blackwell, a licensed psychologist, prepared a neurological evaluation report (the "Blackwell Report"). At the time of the Blackwell Report, on February 5, 2015, Officer Couret-Rios denied any remaining physical symptoms and noted that he had returned to all physical activities including exercising and weightlifting every day. Dr. Blackwell determined, however, that Officer Couret-Rios had developed cognitive symptoms:

> In my opinion, and to a reasonable degree of neuropsychological certainty, Mr. Couret[-Rios] sustained a mild traumatic brain injury/concussion on August 12, 2014 based upon his reports of head jolting, possible loss of consciousness, brief post-traumatic amnesia or disruption in mental status at the time of the injury, and subsequent post-concussive symptoms. His profile indicates a pattern of select cognitive deficits with multiple aspects of attention and short-term/working memory most adversely impacted on testing. These cognitive deficits are, more likely than not, a function of his continued recovery from the concussion sustained on August 12, 2014. His history of premature birth also cannot be ruled out as a contributing factor to his neurocognitive weaknesses.

Dr. Blackwell concluded that Officer Couret-Rios's symptoms were "consistent with . . . a Mild Neurocognitive Disorder secondary to" a concussion but that he "has already evidenced significant signs of recovery of both physical and cognitive symptoms, though the likelihood of further recovery is certainly possible."

By June 4, 2015, a police department physician determined that it was "highly unlikely" that Officer Couret-Rios would be able to return to full duty service. Two months later, on August 28, 2015, Officer Couret-Rios was told by the same physician that he had "permanent" "limitations which prevent[ed] him from performing all of the essential functions of a police officer in a safe, reliable, and ongoing manner."

11

Dr. Walter Kozachuk, a neurologist, examined Officer Couret-Rios on November 3, 2015 and concluded in a written report that the officer had "48% whole person impairment" including memory, back, and physical endurance impairments, and headaches.

Officer Couret-Rios timely applied for line-of-duty disability retirement on February 2, 2016 (the "Application"). On the Application, Officer Couret-Rios checked boxes stating that he had both a "Physical" and "Mental" incapacity and, on another part of the application, described the "cause of [his] disability" as "pain to head, neck, back, including post[-]concussion syndrome and psychological problems." According to the Application, Officer Couret-Rios was now incapable of performing "Almost All" of his principal duties as a law enforcement officer, with the exception being "limited report writing." The Application also included a statement from Dr. Kozachuk diagnosing Officer Couret-Rios with concussion, headaches, dizziness, nausea, ataxia,[4] absence spells, memory loss, and dysphasia.[5] Dr. Kozachuk's statement also included Officer Couret-Rios's subjective complaints of neck pain, loss of balance, insomnia, and depression. Absent from the application was any mention of back pain.

---

[4] "Ataxia" is "an inability to coordinate voluntary muscular movements that is symptomatic of some central nervous system disorders and injuries and not due to muscle weakness." *Ataxia*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ataxia (last visited April 30, 2020), archived at https://perma.cc/5SVZ-4WD6.

[5] "Dysphasia" is "loss of or deficiency in the power to use or understand language as a result of injury to or disease of the brain." *Dysphasia*, Merriam-Webster, https://www.merriam-webster.com/dictionary/dysphasia (last visited April 30, 2020), archived at https://perma.cc/VQN7-NR2B.

As part of the disability application process, F&P gathered Officer Couret-Rios's pre-injury and post-injury medical records. Officer Couret-Rios was also evaluated by several medical experts in connection with his disability claim, all of whom produced written reports. The relevant medical evaluations included:

- Dr. Douglas Shepard, Independent Medical Evaluation, October 11, 2016

- Dr. Michael Sellman, Independent Neurological Evaluation, December 29, 2016

- Dr. Stephen Siebert, Psychiatric Independent Medical Evaluation, March 7, 2017

- Dr. Louis Halikman, Independent Orthopedic Consultation, April 27, 2017

## C.    The Administrative Hearing & Report.

On June 28, 2017, a hearing examiner held a § 33(*l*) hearing on Officer Couret-Rios's Application for LOD benefits. Officer Couret-Rios argued that his "three main" disabling complaints were (1) headaches; (2) lower back pain; and (3) "cognitive neurological issues, memory, those kind of things." Officer Couret-Rios testified at the hearing and provided examples of how his neurological issues might affect his performance as a police officer. In connection with his poor memory, Officer Couret-Rios testified that he might forget that he confiscated drugs or have problems recalling faces and facts while testifying against a suspect. He further testified that at one point, he forgot that he had a daughter and, on several occasions, recognized co-workers but could not recall their names.

With regard to the headaches, Officer Couret-Rios testified that even prior to the accident he suffered from headaches while working full time and that if the headaches were his only malady, that he would still be able to perform his job. As to the back pain, Officer Couret-Rios testified that he would not be able to chase suspects or sit or stand for long

13

periods of time, and worried that a suspect could easily overpower him in a physical altercation. Officer Couret-Rios testified that the back pain alone incapacitated him so severely that, if he continued as a police officer, he would "get killed."

After considering the testimony and over 600 pages of medical records, the hearing examiner issued a written report including her factual findings and legal conclusions. The report included summaries of the testimony, the written medical records, and the "EXPERT EVALUATIONS."

In the "EXPERT EVALUATIONS" section, the hearing examiner summarized the expert reports provided by both parties. Officer Couret-Rios's experts included Dr. Kozachuk, a neurologist, and Dr. Shepard, an orthopedist. Dr. Kozachuk's report mirrored his statement in the Application that provided a disability rating of 48% temporary total disability and ratings of anatomical loss to speech, neck, back, and central nervous system. Dr. Shepard reported anatomical loss ratings as to orthopedic issues: 12% impairment to thoracic spine, 22% impairment to lumbar spine, and 15% left hip. Dr. Shepard also referred to a report by orthopedic spine surgeon Dr. Chad Rutter.[6] According to Dr. Shepard, Dr. Rutter diagnosed Officer Couret-Rios with lumbar disk disorder and radiculopathy. Dr. Rutter reviewed a magnetic resonance imaging ("MRI") scan taken on February 29, 2016 and opined that Officer Couret-Rios had "L4-L5 degenerative disk disease, small disk bulge and moderate foraminal stenosis."

---

[6] Dr. Rutter's report is not present in the record.

14

F&P submitted reports from Dr. Sellman, Dr. Siebert, and Dr. Halikman. Dr. Sellman, a neurologist, concluded that the original injury to the head was mild. He stated he could not relate the constellation of symptoms to the motor vehicle accident. Although he determined that Officer Couret-Rios was permanently and totally disabled, he did not believe that Officer Couret-Rios sustained an incapacitating neurological injury in the accident.

Dr. Siebert provided a diagnosis of mild neurocognitive disorder due to concussion but stated that Officer Couret-Rios's prognosis was "guarded" due to multiple preexisting medical problems including diabetes and hypertension. Dr. Siebert concluded that Officer Couret-Rios's cognitive difficulties were disabling but that such difficulties were related to both preexisting medical conditions and the injuries caused by the automobile accident.

Dr. Halikman, an orthopedic surgeon, examined Officer Couret-Rios in relation to his complaints of lower back pain. In his report, Dr. Halikman concluded,

> [i]t is my impression that this patient does not have objective evidence of disability due to a low back injury. At the time of the accident in 2014 his primary orthopaedic complaint involved neck pain. Back pain developed afterwards and there was significant improvement with ordinary physical therapy and conventional treatment. On an objective basis today, lumbar spine function appears satisfactory. . . .
>
> It is my opinion, therefore, that from an orthopaedic point of view, disability retirement is not established.

The hearing examiner next outlined the controlling law whereby she cited *Kielczewski*, 77 Md. App. at 581, for the proposition that "[b]enefits for NLOD disability may be awarded on the basis of a mental or physical incapacity[, but b]enefits for LOD disability can only be awarded based on a physical incapacity." The hearing examiner then

15

announced her factual findings and legal conclusions in a section titled "DECISION." The hearing examiner was unpersuaded that Officer Couret-Rios had suffered a disabling orthopedic injury in the automobile accident. Relying especially on Dr. Halikman's expert report, the hearing examiner had "trouble finding that [Officer Couret-Rios] is disabled due to a back condition related to" the accident. The hearing examiner concluded that "[t]he records indicate any back problem related to the initial injury [are] resolved. The current back problems come much later and per the [February 29, 2016] MRI, the back problems are degenerative."

The hearing examiner, however, found that Officer Couret-Rios was permanently disabled because of "problems relating to attention and memory." Placing particular emphasis on the Blackwell Report, the hearing examiner specifically found that Officer Couret-Rios was "permanently incapacitated from his regular job duties as the result of an injury to his brain" that occurred "while he was in the performance of his duties." Based on that finding, the hearing examiner concluded that Officer Couret-Rios had met the criteria for LOD disability benefits—i.e., that he was physically incapacitated.

On judicial review, the Circuit Court for Baltimore City affirmed the hearing examiner's decision. F&P appealed to the Court of Special Appeals.

D.      *The Court of Special Appeals.*

The Court of Special Appeals reversed in a rare 1-1-1 fractured decision, Judge Kevin F. Arthur for the majority, Judge Timothy E. Meredith concurring, and Judge Andrea M. Leahy dissenting. *See Fire & Police Emps.' Ret. Sys. of Balt. v. Couret-Rios*, No. 02493, Sept. Term, 2017, 2019 WL 1934004 (Md. Ct. Spec. App. Apr. 30, 2019). The

controlling opinion concluded that Officer Couret-Rios's "incapacitation is mental, rather than physical, as those terms are commonly understood" and thus held that the hearing examiner erred in concluding that Officer Couret-Rios was entitled to LOD benefits. *Id.* at *5. According to the Court of Special Appeals, the clear and unambiguous meaning of "physical incapacity" as used in the statute is "the quality or state of being incapable of doing something with the body," as opposed to "with the mind," that the attention and memory deficits disabling Officer Couret-Rios were mental incapacity, and that the hearing examiner's decision allowing him LOD benefits was legal error. *Id.* at *4. The majority opinion began its analysis with the common understanding and dictionary definitions of the words "incapacity," "physical," and "mental," and then confirmed the plain meaning by applying those definitions to the statutory scheme. The majority also highlighted the distinction between physical and mental incapacity, as described in *Kielczewski*. Further, the majority rejected the hearing examiner's attempt to conflate the mental nature of the incapacity itself (i.e., attention and memory deficits) with the physical nature of the injury (i.e., concussion/mild traumatic brain injury) that caused the incapacity, by noting that this Court "declined to equate the terms [in *Marsheck v. Board of Trustees of Fire Police Employees' Retirement System of the City of Baltimore*, 358 Md. 393 (2000)], because its review of the statutory structure established that the City Council had 'made distinction in meaning between the terms "injury" and "disability" or "incapacity."'" *Couret-Rios*, 2019 WL 1934004, at *5 (quoting *Marsheck*, 358 Md. at 408). The majority concluded that "[a]n employee's entitlement to [LOD] benefits depends on whether the *incapacitation* is

17

physical or mental in nature, not on whether he or she suffered physical *injury*." *Id.* (emphasis added).

Judge Meredith concurred with the result but noted that, had there been no controlling precedent, he would agree with the dissent because "the distinction between physical incapacity and mental incapacity seems arbitrary in the context of a traumatic line-of-duty injury to a police officer's brain." *Id.* at \*6 (Meredith, J., concurring).

Judge Leahy dissented, reiterating the arbitrary distinction between physical and mental incapacity and distinguishing *Marsheck*, the case relied upon by the majority. *Id.* at \*6–7 (Leahy, J., dissenting). According to the dissent, "the statute was [not] intended to deny line-of-duty benefits to an officer who is incapacitated by a traumatic brain injury suffered while performing his job" and *Marsheck* does not "forbid[] consideration of the nexus between an injury and a consequent incapacitation." *Id.* at \*6. The dissent, therefore, would have affirmed the decision of the hearing examiner because "there is a direct nexus between the physical injury to the brain and the *disabling* mental impairment suffered by Officer Couret-Rios." *Id.* at \*7.

Officer Couret-Rios filed a petition for writ of certiorari which this Court granted. *Couret-Rios v. Fire & Police Emps.' Ret. Sys. of Balt.*, 465 Md. 663 (2019). He presents one question for our review:

> Did the hearing examiner commit an error of law when she awarded line-of-duty disability benefits based on a finding of fact that [Officer Couret-Rios] suffered from attention and memory deficits as a result of a traumatic brain injury sustained while performing his job?

18

For the reasons that follow, we answer in the negative. After finding that memory and attention deficits were Officer Couret-Rios's only incapacities, the hearing examiner did not err by concluding that those incapacities were physical and thus granting LOD benefits. As such, we reverse the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

Under Article 22, Section 33(*l*)(1), of the Baltimore City Code, F&P hearing examiners are selected on the basis of "demonstrated knowledge and competence in disability claims evaluation." In addition, under § 33(*l*)(12), the determination of the hearing examiner is "presumptively correct" and "may not be disturbed on review except when arbitrary, illegal, capricious, or discriminatory."

Due to the expertise of the hearing examiners, in reviewing administrative decisions this Court "must not itself make independent findings of fact or substitute its judgment for that of the agency." *Md.-Nat'l Capital Park Planning Comm'n v. Anderson*, 395 Md. 172, 180–81 (2006) (quoting *Balt. Lutheran High Sch. Ass'n, Inc. v. Emp't Sec. Admin.*, 302 Md. 649, 662 (1985)). "Of course, a reviewing court may always determine whether the administrative agency made an error of law." *Balt. Lutheran High Sch. Ass'n*, 302 Md. at 662; *see also Hubbel v. Bd. of Trs. of Fire & Police Emps.' Ret. Sys. of Balt.*, 192 Md. App. 742, 749 (2010) (noting that appellate courts "can reverse the agency's legal decisions 'where the legal conclusions reached by that body are based on an erroneous interpretation or application'" of the relevant law (quoting *Overlook LLLP v. Bd. of Cty. Comm'rs of Wash. Cty.*, 183 Md. App. 233, 247–48 (2008))).

The issue in this case is governed by the language of Article 22, §§ 33(*l*), 34(c) and 34(e-1) of the Baltimore City Code. "When we construe a statute, we search for legislative intent." *Bell v. Chance*, 460 Md. 28, 53 (2018) (citing *Hughes v. Moyer*, 452 Md. 77, 94 (2017)). If the language is "unambiguous and its meaning is plain and definite," this Court's "inquiry as to the legislature's intent will end and [we] will not venture outside the words of the statute." *Marsheck*, 358 Md. at 402–03. "If the statute's language is ambiguous, however, we will look towards other sources, such as relevant case law and legislative history, to aid us in determining the legislature's intentions." *Id.* at 403. "Throughout this process, we avoid constructions that are illogical or nonsensical, or that render a statute meaningless." *Bell*, 460 Md. at 53 (citing *Fisher v. E. Corr. Inst.*, 425 Md. 699, 706 (2012); *Frost v. State*, 336 Md. 125, 137 (1994)).

"Remedial legislation, such as governs the retirement system here, must be construed liberally in favor of injured employees in order to effectuate the legislation's remedial purpose." *Marsheck*, 358 Md. at 403; *see, e.g*, *Martin v. Beverage Capital Corp.*, 353 Md. 388, 400 (1999) ("[The] statute should be liberally construed so that any ambiguity, uncertainty or conflict is resolved in favor of the claimant, in order to effect the statute's benevolent purposes." (quoting *Linder Crane Serv. Co. v. Hogan*, 86 Md. App. 438, 443 (1991))); *Montgomery Cty. v. McDonald*, 317 Md. 466, 472 (1989) ("Undoubtedly the [statute] is to be construed liberally in favor of injured employees and to effectuate its remedial purposes . . . .").

**DISCUSSION**

The principal issue before the Court is whether a mild traumatic brain injury that caused attention and memory issues fits the "physical incapacity" classification of the F&P statute, and therefore whether Officer Couret-Rios will be granted LOD, as opposed to NLOD, benefits. Advocating for LOD benefits, Officer Couret-Rios puts forth one primary argument: that memory and attention deficits are "physical incapacities" because they are manifestations of a physical injury to his brain.[7] We agree. The "physical incapacity" classification is ambiguous and open to multiple interpretations, including the interpretation that, in certain circumstances, a physical injury to the brain that causes post-

---

[7] Officer Couret-Rios initially argues that we need not reach the legal issue of how to define "physical incapacity" because the hearing examiner "implied" physical incapacity in her findings. Officer Couret-Rios makes this argument for the first time before this Court. Officer Couret-Rios admits that the hearing examiner "only *explicitly* noted that [Officer Couret-Rios] suffered from attention and memory deficits," but argues that the hearing examiner implicitly found that Officer Couret-Rios had every symptom and incapacity mentioned in the Blackwell Report simply because the hearing examiner found the Blackwell Report "especially persuasive" to her final determination. The hearing examiner's decision, as it related to the Blackwell Report, stated in full:

> I find the Claimant is disabled due to problems relating to attention and memory. I base this decision on my review of the records, and find the [Blackwell Report] to be especially persuasive. Despite giving strong effort during the testing done [by Dr. Blackwell], the Claimant demonstrated difficulty with working memory, attention, and impulsivity at 6 months post-accident, when most improvement from mild [traumatic brain injury]/concussion is expected within 3 to 4 months post injury.

Our reading of the hearing examiner's report does not support Officer Couret-Rios's argument. By finding the Blackwell Report "especially persuasive," the hearing examiner was not implicitly adopting the entirety of the Blackwell Report. Rather, she was setting forth her reasons, as required by § 33(*l*)(12), for her finding of memory and attention incapacity.

21

concussion syndrome is a "physical incapacity."  We begin with the plain meaning of the statute.

### A.     *Plain Meaning Analysis.*

To determine plain meaning, F&P and the Court of Special Appeals start with the dictionary definition of "incapacity" and "physical."[8]  According to *Merriam-Webster*, "incapacity" means "the quality or state of being incapable."  *Incapacity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/incapacity (last visited Apr. 9, 2020), archived at https://perma.cc/J6JX-484J.  "Physical incapacity," the Court of Special Appeals concluded, is therefore the quality or state of being incapable of doing something physical, while "mental incapacity" is the quality or state of being incapable of doing something mental.  F&P argues that neither Officer Couret-Rios nor the dissenting judge below point to any ambiguity in those definitions, therefore the statutory analysis should end there.  *See Marsheck*, 358 Md. at 402–03 ("[I]f the language of the statute is unambiguous and its meaning is plain and definite, our inquiry as to the legislature's intent will end and we will not venture outside the words of the statute.").  In addition, F&P

---

[8] "To determine the ordinary meaning of those words, we find it helpful to consult their dictionary definitions."  *Neal v. Balt. City Bd. of Sch. Comm'rs*, 467 Md. 399, 417 n.10 (2020) (quoting *Bd. of Educ. of Prince George's Cty. v. Marks-Sloan*, 428 Md. 1, 28 (2012)); *see Marriott Emps. Fed. Credit Union v. Motor Vehicle Admin.*, 346 Md. 437, 447 (1997) ("Although dictionary definitions do not provide dispositive resolutions of the meaning of statutory terms, dictionaries do provide a useful starting point for determining what statutory terms mean, at least in the abstract, by suggesting what the legislature could have meant by using particular terms." (internal citations and original omission omitted)).

asserts that Officer Couret-Rios is entitled only to NLOD benefits because attention deficit and memory issues are "mental incapacities."

To the contrary, the very premise of this appeal points to an ambiguity in the F&P statute—the language of the statute is ambiguous as to whether a "physical incapacity" includes post-concussion manifestations. As F&P concedes, "the brain is our most complex organ and the mind is an endless mystery." Indeed, the distinction between "physical capacity" and "mental capacity" appears to invoke the "mind-body problem" that has dogged philosophers for centuries. But we do not have to solve the mind-body problem to decide this case.

Instead, the statute requires deference to the expertise of the hearing examiner. In her decision, the hearing examiner described at length the Blackwell Report that related Officer Couret-Rios's cognitive deficits to the mild traumatic brain injury that he suffered on August 12, 2014. It is safe to say that these deficits have a source in a physical incapacity in the part of the brain that governs short term memory. This sort of incapacity is distinguishable from a mental incapacity that is less easy to attribute to a physical source—for example, if he had developed a debilitating fear of riding in a police car as a result of the accident.

Judge Leahy, dissenting below, put it this way:

[A] traumatic brain injury impairs the mind, just as injury to the eye impairs vision, and injury to the ear drum impairs hearing. Each of these capacities do not have observable physical qualities, yet impairments to one's sight, hearing, and cognition can be physically incapacitating. (Of course, not every brain injury results in a mental incapacity, just as injury to another organ or limb may not result in an incapacity.)

23

*Couret-Rios*, 2019 WL 1934004, at *6 (Leahy, J., dissenting).

It is unreasonable to conclude that the City Council enacted the physical-mental distinction to diminish the retirement benefits of police officers and fire fighters simply because an incapacity is related to the brain. Indeed, it would seem contrary to the remedial nature of the statute to de facto punish an officer for such an injury, which can often be more physically debilitating than other clear-cut "physical" incapacities.

As F&P points out, the mental-physical distinction derives from the nature of retirement systems. The benefit distinctions do not "absolve employers of liability for brain injuries," as the dissent below argues, but rather lessen the payout from the retirement system. *See id.* at *7 (Leahy, J., dissenting). Unlike a workers' compensation statute that is focused on legal liability, the F&P statute is a retirement benefits system funded by the very members who are entitled to benefit from it. Like a statute of limitations, the distinction sets a bright line that, according to F&P, reduces the cost of fraud and increases confidence in causation within the system. F&P notes that "[m]ental incapacities are just as real, and sometimes more debilitating, than physical incapacities, but because the brain is our most complex organ and the mind is an endless mystery, from the perspective of a retirement benefit system trying to maximize the Members' collective benefits, mental incapacities are more challenging to verify in terms of existence and in terms of causation."

Symptoms of post-concussion syndrome, including memory and attention deficits, unlike a fear of riding in a police car, are not "challenging to verify in terms of existence

24

and in terms of causation."[9] The record makes clear, and the hearing examiner concluded, that Officer Couret-Rios is suffering from these maladies as a result of the automobile accident on August 12, 2014.

We therefore conclude that the term "physical incapacity" is ambiguous in the context of the F&P statute. To divine legislative intent, then, we next turn to the case law.

## B. *Applying the Case Law.*

In *Kielczewski*, a firefighter lost vision in one eye while fighting a fire, and as a result, his "emotional and mental state deteriorated."[10] 77 Md. App. at 583. Both parties agreed that the firefighter was able to physically perform his duties, but that his psychological problems rendered him mentally incapacitated. The Court of Special Appeals held that the firefighter was eligible only for NLOD benefits because a physical incapacity is a "condition precedent" to an award of LOD benefits. *Id.* at 592.

Here, neither party argues that a physical incapacity is a "condition precedent" to an award of LOD benefits. But we see a material difference between a physical injury to the eyeball leading to a mental incapacity, like in *Kielczewski*, and a physical injury to the brain leading to post-concussion syndrome and attention and memory deficits. The incapacity suffered by the claimant in *Kielczewski* represents the type of incapacity that is "more challenging" to attribute to a physical source, namely a "mental" incapacity that is

---

[9] Although as indicated *infra* notes 12–15, there are challenges with proper treatment and continuing diagnoses.

[10] The court did not elaborate on the firefighter's emotional and mental maladies.

25

not a direct objective manifestation of a physical incapacity. *See Couret-Rios*, 2019 WL 1934004, at *7 (Leahy, J., dissenting) ("A physical injury to part of the body other than the brain, as in [*Kielczewski*], would not carry the same nexus to any resulting mental incapacity.").

That being the case, we are careful to distinguish between "incapacity" and "injury" in the context of the F&P statute. This Court, in *Marsheck*, addressed that distinction in a statute of limitations case. 358 Md. at 393. There, a police officer suffered a back injury that was not immediately disabling, but eventually left her physically incapacitated. The police officer submitted her application for LOD benefits within five years of becoming incapacitated but not within five years of the injury that caused the incapacitation, as required by the F&P statute. She was therefore granted only NLOD benefits. She urged this Court to conflate the meanings of "injury" and "incapacity" in order to receive the more substantial LOD benefits. The Court disagreed with the police officer and held that "injury" and "incapacity" are distinct words for the purposes of the F&P statute. The Court noted that such a bright line limitation—i.e., running a five-year application deadline from the date of *injury*—should not be disturbed by the judiciary where the Baltimore City Council enacted such a plain rule.

F&P argues, and the Court of Special Appeals held, that because *Marsheck* distinguished "injury" from "incapacitation," the hearing examiner erred in conflating the "physical" nature of the injury—a concussion—with the "mental" nature of the incapacity—memory and attention deficits. Officer Couret-Rios argues that *Marsheck* is distinguishable. He contends that, although "the *Marsheck* Court distinguished the terms

26

'injury' and 'incapacitation' for the purpose of applying the statute's time limitation," the holding in *Marsheck* does not "forbid[] consideration of the nexus between an injury and a consequent incapacitation." *Couret-Rios*, 2019 WL 1934004, at *6 (Leahy, J., dissenting). We agree that both the context—a statute of limitations case—and the justification for that context, are dissimilar from the case at hand. *See Marsheck*, 358 Md. at 401–02 (explaining that the statute's time limitation served to "1) protect against frivolous claims; and 2) supply the relatively greater certitude of objectively verifiable dates and events in lieu of potentially difficult questions of proof and causation that may be presented otherwise").

We also agree that *Marsheck* is distinct from this case. As we reiterated above, if there is ambiguity or doubt as to how the statute should be interpreted, the canons of statutory construction prefer a liberal interpretation of remedial legislation such as the F&P statute. In *Marsheck*, the Court did not apply that principle because the issue there was a clear-cut statute of limitations, a procedural question to which the principle of liberal interpretation (even in this context or the context of a workers' compensation statute) does not apply. 358 Md. at 403–05. The case before us now does not involve a limitations issue, but rather whether a claimant qualifies for LOD benefits based on the ambiguous definition of "physical incapacity"—the heart of the substance of the statute.

As noted, we do not need to solve the "mind-body" problem to resolve this ambiguity. A look to brain science from the last five years, however, helps clarify our understanding of the F&P statute because much has developed in that field since Officer Couret-Rios was injured in the automobile accident in 2014. By applying modern

27

neuroscience to the F&P statute, attention and memory issues that result from physical injuries to the brain could be identified as "physical incapacities" or "mental incapacities" depending upon the facts of the case.

Concussions—termed "mild traumatic brain injuries" ("mild TBI") in the medical field[11]—are extremely complex and brain research is rapidly changing on the subject. Medical professionals agree that there are various levels of TBI, including a wide spectrum of mild TBI.[12] The severity of TBI is typically defined at the time of the initial injury but

---

[11] Indeed, the terms are used interchangeably in the literature and are often treated as synonymous. Noah K. Kaufman et al., *What Attorneys and Factfinders Need to Know About Mild Traumatic Brain Injuries*, 12 Psychol. Inj. & L. 91, 91 (2019) (citing Ronald M. Ruff et al., *Recommendations for Diagnosing a Mild Traumatic Brain Injury: A National Academy of Neuropsychology Education Paper*, 24 Archives Clinical Neuropsychol. 3, 3–10 (2009)); *see* Betsy J. Grey & Gary E. Marchant, *Biomarkers, Concussions, and the Duty of Care*, 2015 Mich. St. L. Rev. 1911, 1911 n.1, 1922 n.63 (2015) (citing Kimberly G. Harmon et al., *American Medical Society for Sports Medicine Position Statement: Concussion in Sport*, 47 Brit. J. Sports. Med. 15, 16–17 (2013)) ("[M]ost lay people, policymakers, athletes, and coaches use the term 'concussion' to refer to a constellation of neurological symptoms, such as dizziness, clouded thinking, and even unconsciousness, that can result from a head trauma. However, the term concussion is not a medically precise or defined term. Rather, specialists refer to mild traumatic brain injury, with the word 'mild' distinguishing concussive injuries from more severe brain injuries resulting from major traumas, such as a bullet, explosion, or car accident that permanently disfigures the brain.").

[12] *Traumatic Brain Injury Information Page*, Nat'l Inst. Neurological Disorders & Stroke, https://www.ninds.nih.gov/Disorders/All-Disorders/Traumatic-Brain-Injury-Information-Page (last visited Apr. 13, 2020), archived at https://perma.cc/4TAS-YVB9; *see* Grey & Marchant, *supra* note 11, at 1922–23; Kaufman et al., *supra* note 11, at 92–93; Shauna Kashluba et al., *Neuropsychologic and Functional Outcome After Complicated Mild Traumatic Brain Injury*, 89 Archives Physical Med. & Rehabilitation 904, 904 (2008) (discussing the Glasgow Coma Scale, a widely used classification metric); Jorge Humberto Mena, *Effect of the Modified Glasgow Coma Scale Score Criteria for Mild Traumatic Brain Injury on Mortality Prediction*, 71 J. Trauma 1185, 1186 (2011).

the severity of the injury defined initially does not necessarily predict the trajectory or natural history of TBI, as individuals diagnosed with mild TBI can experience ongoing impairment.[13] Here, for example, multiple doctors noted that Officer Couret-Rios suffered more severe symptoms and suffered longer than a typical mild TBI patient would.

The distinction between mild TBI and more severe TBI

although widely accepted, is inexact; TBI is considered a spectrum, and the precise distinction between the two levels of brain injury lacks consensus in both medicine and law. . . . There is no agreed-upon definition of m[ild ]TBI or concussion, because there is no consensus on objective criteria for defining and diagnosing this type of injury. Rather, m[ild ]TBI currently remains a subjective clinical diagnosis based primarily on patient history and observable behavioral symptoms. . . . It is not surprising that this spectrum of symptoms exists, considering the diverse ways in which a brain injury can happen, as well as the different brain structures that could be affected by the external trauma. . . . Furthermore, therapy for brain repair is controversial; the type of care the individual should receive during recuperation is not agreed upon. Some doctors prescribe brain silence (no reading, no math, no computers), while others say some brain stimulation is therapeutic. Some researchers suggest that treatment may depend on what part of the brain received the

---

[13] *Evaluation of the Disability Determination Process for Traumatic Brain Injury in Veterans*, National Academies of Sciences, Engineering, and Medicine 26, 27, 98 (2019), https://www.ncbi.nlm.nih.gov/books/NBK542602/pdf/Bookshelf_NBK542602.pdf, archived at https://perma.cc/B5T8-BBFA; Grey & Marchant, *supra* note 11, at 1923; Douglas H. Smith et al., *Therapy Development for Diffuse Axonal Injury*, 30 J. Neurotrauma 307, 313 (2013).

     On a related but separate note, diagnosis issues can have negative effects in the disability determination process "because [disability] labels often engender self-fulfilling prophecies. Patients may be led to believe that they are incapable of getting better; that they are permanently disabled, and that they lack control over their present and future status. Further, by virtue of being inappropriately diagnosed, patients may be referred for expensive and labor-intensive treatment or management services that they either don't need or which is downright detrimental to their post-accident recovery." Kaufman et al., *supra* note 11, at 91. Some medical experts have commented that many disability cases would have different outcomes if the worker had been diagnosed properly. *See id.* at 102–04 (discussing *White v. Guest Servs., Inc.*, 814 S.E.2d 626 (N.C. Ct. App. 2018); *In re Williams*, 409 P.3d 1219 (Wyo. 2018)).

trauma. And even harder is determining whether chronic brain damage has occurred (and its cause) or whether certain individuals might be more susceptible . . . .[14]

Although a mild TBI does not typically result in any permanent physical incapacities,[15] there are scenarios such as Officer Couret-Rios's where a mild TBI leads to physical incapacity. Given the inexact nomenclature, diagnoses, and treatment of mild TBIs, Maryland courts will have to continue to rely on the medical records and findings of hearing examiners.[16] Due to such medical uncertainty, nothing in this Opinion should be interpreted to mean that every case involving a brain injury qualifies for LOD benefits under the F&P statute.

Providing the proper deference to the hearing examiner in this case, however, demands that Officer Couret-Rios is entitled to LOD benefits. The hearing examiner clearly understood that "physical incapacity" was a prerequisite for LOD benefits, as she cited *Kielczewski* for that proposition in her decision. The hearing examiner then relied on

---

[14] Grey & Marchant, *supra* note 11, at 1923–25.

[15] *Traumatic Brain Injury Information Page*, *supra* note 12; Grey & Marchant, *supra* note 11, at 1922–23; Kaufman et al., *supra* note 11, at 92–93.

[16] Although, at least one court has indicated that memory and attention symptoms resulting from post-concussion syndrome are "physical" symptoms. In *Krepps by Krepps v. Ausen*, 479 S.E.2d 290 (S.C. Ct. App. 1996), where a minor incurred a closed head injury in an automobile accident and relatives of the minor sued the drunk driver who caused the accident, a neurologist testified that closed head injuries often result in post-concussion syndrome, which is evidenced by physical symptoms such as personality change, drop in school performance, headache, fatigue, sleep disturbance, mood alteration, irritability, and memory loss. Like the child in *Krepps*, Officer Couret-Rios suffered a head injury during a car accident, experienced memory loss, and was diagnosed with post-concussion syndrome.

the Blackwell Report—a neurological evaluation performed by a licensed psychologist—to conclude that Officer Couret-Rios was permanently physically incapacitated. We cannot say, therefore, that the determination of the hearing examiner was "arbitrary, illegal, capricious, or discriminatory." Balt. City Code, Art. 22, § 33(*l*)(12). Nothing about that conclusion is unreasonable and we refuse to "make independent findings of fact or substitute [our] judgment for that of the agency." *Anderson*, 395 Md. at 180–81 (quoting *Balt. Lutheran High Sch. Ass'n*, 302 Md. at 662).

Just as a court cannot change the meaning of a statute, neither can a legislative body freeze medical understanding of the mind and body to limit "physical incapacity" to the meaning it may have had in 1966—or at least it cannot without making it quite clear that that is what it intends to do. Indeed, the fact that the legislative body here used a general phrase like "physical incapacity" instead of listing every type of eligible incapacity is evidence that the legislative body did not intend for the statute to be frozen in that way. There are likely numerous examples of symptoms once labeled a "mental incapacity" that are now known to be manifestations of a physical incapacity. Through a remedial lens, the City Council of Baltimore could not have meant to remove all manifestations of a physical incapacity caused by a brain injury from the definition of "physical incapacity." We therefore conclude that the definition of "physical incapacity" includes, in certain circumstances, manifestations of a physical incapacity caused by a brain injury. Here, Officer Couret-Rios's brain was physically injured and incapacitated which manifested in post-concussion syndrome and memory and attention deficit.

There is no doubt that neurological science has made great strides since the F&P statute was enacted in 1966. While we make no determination as to the contemporary merits of the policy behind the benefits distinction,[17] in consideration of the modern understanding of concussions and traumatic brain injuries, it may be advisable for the City Council to revisit the language of the statute.[18] *See, e.g.*, *In re S.K.*, 466 Md. at 57–58 ("[I]n light of these policy concerns, such legislation ought to be considered by the [legislature] in the future.").

---

[17] Judges Meredith and Leahy below expressed concern over the arbitrary distinction between physical and mental incapacities and suggested that the statute be amended. In that vein, Judge Meredith presents the absurd but feasible scenario where

> a police officer who is shot in the head but regains full use of all of the officer's body parts is denied line-of-duty disability benefits regardless of the severity of mental incapacity, whereas an officer who is shot in the head and does not regain full use of the officer's body parts is entitled to line-of-duty benefits even if that officer makes a full recovery of mental faculties.

*Couret-Rios*, 2019 WL 1934004, at *6 (Meredith, J., concurring); *see also id.* at *6 (Leahy, J., dissenting) ("Perhaps the statute requires clarifying amendments . . . .").

[18] Similar retirement systems in Maryland do not rely on a distinction between "physical" and "mental" incapacities. For example, under the Howard County Police and Fire Employees' Retirement Plan, whether the claimant receives the less substantial "ordinary disability" benefits or the more substantial "line of duty disability" benefits, depends only on whether the "total and permanent disability" was "incurred as a result of an accident or injury which has been sustained as an active covered individual and which has been ruled compensable under the Maryland Workers' Compensation Act." If so sustained, the claimant is entitled to "line of duty" benefits. Howard Cty. Code, § 1.431A(a)–(b). Otherwise, the claimant is entitled to "ordinary disability" benefits. *See id.* In either case, "total and permanent disability" is defined as "a medically determinable physical or mental impairment which can be expected to be permanent or result in death, and by reason of which the participant will be prevented from performing the usual duties of his or her position with the County as required by the County Code." *Id.* § 1.431A(e)(3)(i).

## CONCLUSION

We hold that the hearing examiner did not err when she awarded line-of-duty disability benefits based on a finding of fact that Officer Couret-Rios suffered from attention and memory deficits as a result of a mild traumatic brain injury.  Officer Couret-Rios is entitled to line-of-duty retirement benefits.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. COSTS TO BE PAID BY RESPONDENT.**