*Travelocity.com LP n/k/a TVL LP v. Comptroller of Maryland*, No. 14, September 2020 Term.  Opinion by Hotten, J.

**TAXATION – SALES AND USE TAX – ONLINE TRAVEL COMPANIES – HOTEL ROOMS AND CAR RENTALS – PRIOR TO THE 2015 AMENDMENT – SALE OF TANGIBLE PERSONAL PROPERTY.**  Prior to the 2015 amendment to the sales and use tax, Md. Code (2010 Repl. Vol. and 2014 Supp.) § 11-102(a) of the Tax–General Article, which specifically included "accommodations intermediary" into the statutory definition of "vendors" liable to pay the sales and use tax, the facilitation of hotel room or car rental reservations did not constitute a sale of tangible personal property that would result in liability for the sales and use tax.

**TAXATION – SALES AND USE TAX – ONLINE TRAVEL COMPANIES – PRIOR TO THE 2015 AMENDMENT – VENDORS.**  Prior to the 2015 amendment to the sales and use tax, Md. Code (2010 Repl. Vol. and 2014 Supp.) § 11-102(a) of the Tax–General Article, which specifically included "accommodations intermediary" into the statutory definition of "vendors" liable to pay the sales and use tax, online travel companies were not considered "vendors" liable for the tax.

IN THE COURT OF APPEALS

OF MARYLAND

No. 14

September Term, 2020

_____

TRAVELOCITY.COM LP n/k/a TVL LP

v.

COMPTROLLER OF MARYLAND
_____

Barbera, C.J.,
McDonald,
Watts,
Hotten,
Getty,
Booth,
Biran,

JJ.

_____

Opinion by Hotten, J.
Barbera, C.J., McDonald and Watts, JJ.,
dissent.

_____

Filed: April 30, 2021

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

This appeal stems from a tax dispute between the Respondent, Comptroller of Maryland ("Comptroller"), and the Petitioner, Travelocity.com LP ("Travelocity"), regarding whether Travelocity was liable for sums due under the sales and use tax, pursuant to Md. Code (2010 Repl. Vol. and 2014 Supp.) § 11-102(a) of the Tax–General Article ("Tax Code"),[1] between 2003 until 2011.

The Maryland Tax Court determined that Travelocity was liable for the tax, but not grossly negligent in failing to pay the sales and use tax during the audit period.[2] Both parties sought judicial review of the Tax Court decision in the Circuit Court for Anne Arundel County, which affirmed. Thereafter, the parties noted an appeal to the Court of Special Appeals. Prior to the consideration of the case by the Court of Special Appeals, we granted a petition for *certiorari* from Travelocity and a cross-petition from the Comptroller to address several questions, which we have rephrased and consolidated for the sake of clarity:

1. Whether the Tax Court erred by holding Travelocity liable for the sales and use tax during the audit period.

2. Whether the Tax Court erred in determining that Travelocity did not act with gross negligence under Tax–Gen. § 13-1102(b).

---

[1] The statutory tax provisions, as they existed during the audit period, are codified in the 2010 Replacement Volume and the 2014 Supplement of the Maryland Code and we will refer to them as the "Tax Code." Citations to other statutes currently in effect, if any, will be referred to by the usual citation: Md. Code, Tax–General ("Tax–Gen.").

[2] The Tax Court decision also addressed several subsidiary issues relevant to determining the correct amount of tax assessed, assuming liability.

3. Whether the Tax Court erred in determining that the tax recovery charge was not included in the taxable price under Tax–Gen. § 11-302.[3]

---

[3] The *certiorari* petition from Travelocity presented the following questions:

l. Whether [Petitioner]'s activities in Maryland during the periods covered by the assessment, March l, 2003 through April 30, 2011 (the "Periods in Issue") resulted in the provision of a "right to occupy a room or lodgings as transient guest," within the meaning of Section 11-101(k)(1)(ii) of the Tax-General Article.

2. Whether [Petitioner] was a "Vendor" during tax relevant periods, within the meaning of Section 11-101(o) of the Tax-General Article.

3. Whether the Tax Court failed to give effect to Chapter 3, Act of 2015 which altered the definitions of "Tangible personal property" and "Vendor."

4. Whether the Tax Court erred in determining that the base for calculating the sales tax had to be reduced by the "Tax Recovery Charge."

5. Whether the Tax Court erred in deciding that Section 13-1102(b) did not apply to permit the Comptroller to assess sales taxes beyond the four year limitation period.

Additionally, the cross-petition from the Comptroller presented the following questions:

1. Did the evidence in the record establish that [Petitioner] sold its customers the right to occupy a room or lodgings as a transient guest, a transaction subject to the sales-and-use tax under § 11-101(k)(1)(ii) of the Tax-General Article, when the customers reserved the room on [Petitioner]'s website and paid [Petitioner] for the room reservations made on [Petitioner]'s website?

2. Did the evidence in the record establish that [Petitioner] rented to its customers, on a short-term basis, passenger cars or other vehicles, a transaction that is subject to the sales-and-use tax under § 11-101(k)(1)(i) of the Tax-General Article, when the customers paid [Petitioner] for the rental car reservations made on [Petitioner]'s website?

3. Did the Maryland Tax Court correctly conclude that because [Petitioner] sold tangible personal property located in Maryland, [Petitioner] was required to collect and remit sales-and-use tax as a vendor engaged in the business of a retail vendor or out-of-state vendor under § 11-701 of the Tax-General Article?

4. Did the Maryland Tax Court err in holding that sales-and-use tax

(continued . . .)

2

We answer the first question affirmatively and reverse the decision of the Tax Court. Since we conclude that Travelocity was not liable to pay the sales and use tax during the relevant audit period, we need not reach the remaining issues presented.

## FACTUAL AND PROCEDURAL BACKGROUND

### Underlying Factual Background

During an audit period between March 1, 2003 and April 30, 2011, Travelocity operated as an online travel company that provided an independent platform to review and request reservations from third-party airlines, hotels, and rental car agencies.[4] Travelocity entered into contracts with the hotel and car rental agencies whereby it gained access to the central reservation system of the hotels and car rental agencies to ascertain availability. Travelocity subsequently listed the available rooms and vehicles on its website for prices lower than otherwise advertised by the hotel and car rental agencies. To make a hotel or car rental reservation on Travelocity's website, a customer would select his or her desired reservation, which Travelocity forwarded to the relevant agencies, and awaited the final determination of rate and availability in real time. If the third-party agency issued the reservation, Travelocity then provided the customer with those details. Travelocity

---

(. . . continued)

   was not due on the lump sum fee for service charges and estimated taxes that [Petitioner] charged its customers, when the sales-and-use tax was not separately stated from the service charges and the portion attributable to the estimated tax was not remitted to the Comptroller but paid to a third party?

   [4] This case revolves around Travelocity's business model during the relevant audit period. In January of 2015, Travelocity.com LP sold its assets and operations to Expedia, Inc. and now operates as TVL LP, which does not run an online travel company.

remained the intermediary between the third-party company and the customer, handling payments, confirmation information, and cancellations. For its service, Travelocity charged customers a rate higher than the net rate that the hotels and car rental agencies offered to Travelocity, consolidating the net rate, fees, and other charges in one lump sum to be paid by the customer. Thereafter, Travelocity paid the hotels and car rental agencies the net rate for the room plus taxes.

On November 11, 2011, the Maryland Comptroller assessed a sales and use tax on the difference between the tax on the net rate paid by the hotels and car rental agencies and the amount of tax assessed by the Comptroller against Travelocity, relative to the marked up rate. The tax assessment consisted of $3,078,814.11 in sales and use tax, $1,828,515.58 in interest, and $1,077,584.94 in penalties for an aggregate amount of $5,985,214.63. On November 16, 2012, a final determination was issued by the Comptroller, which included updated interest, and amounted to $6,419,897.80.

**Procedural History**

**Tax Court**

On December 13, 2012, Travelocity appealed the Comptroller's sales and use tax assessment to the Maryland Tax Court. Travelocity argued that only a "vendor" of hotel rooms and rental cars was required to pay the tax. As defined during the audit period, a "vendor" sold or delivered "the right to occupy a room or lodging" or transferred "title or possession" of rental cars. Travelocity argued that, as an online travel company, it neither owned nor controlled the right to occupy or possess any hotel rooms or rental cars which could support an assessment of liability for the tax.

4

Travelocity further relied on subsequent legislative action in support of its contention that it was not included in the sales and use tax, because it did not qualify as a "vendor" for purposes of taxation. The Maryland General Assembly amended the sales and use tax statute, Tax–Gen. § 11-102, in 2015 to include an "accommodations intermediary" into the definition of a "vendor." In Travelocity's view, the later inclusion of an "accommodations intermediary" into the statute suggests that it was not included in the prior version of the sales and use tax statute.

On December 18, 2017, the Tax Court issued a final memorandum and order. The Tax Court held that Travelocity's business of facilitating vehicle rentals and hotel room reservations was included in the sale of tangible personal property in Maryland, thereby rendering it liable for the tax during the audit period. The Tax Court explained that Travelocity was engaged in the business of a retail vendor because it sold the right to occupy a hotel room or rent a vehicle, both of which were considered tangible personal property.

The Tax Court also determined that Travelocity was not negligent in failing to pay the tax during the audit period. The Tax Court acknowledged that "there is a good faith dispute as to whether the tax applies to Travelocity" and that it had acted in good faith in appealing to the Tax Court. The Tax Court granted partial summary judgment in favor of the Comptroller concerning the sales and use tax and granted partial summary judgment in favor of Travelocity limiting the Comptroller's assessment regarding penalties, interest, and a four-year statute of limitations. The Tax Court reduced the total assessment of the tax, penalties, and interest from $6,419,897.80 as asserted by the Comptroller to

5

$295,434.38 for the tax owed, without any penalties, "plus interest from December 18, 2017."

**Circuit Court**

Both parties petitioned for judicial review of the Tax Court decision in the Circuit Court for Anne Arundel County. For procedural reasons, Travelocity's cross-petition for judicial review was initially dismissed by the circuit court, but later revived and considered independent of the Comptroller's petition.

On November 19, 2018, the Comptroller appealed the Tax Court's finding that Travelocity was not grossly negligent in failing to pay the sales and use tax during the audit period. The Comptroller also challenged the Tax Court's ruling that the tax recovery charge was not taxable income. Following a hearing on May 6, 2019, the circuit court, in affirming the decision of the Tax Court, found that the decision was legally correct and supported by substantial evidence.

On December 13, 2018, Travelocity filed a cross-petition for judicial review, which was initially dismissed by the circuit court on January 14, 2019 for procedural errors. The circuit court later vacated its earlier dismissal of Travelocity's petition on July 1, 2019 and held a hearing on November 18, 2019. Travelocity argued that the determination of the Tax Court was not supported by the record and that the Tax Court erred as a matter of law by concluding that it was liable for the tax. On January 30, 2020, the circuit court affirmed the decision of the Tax Court.

**Court of Special Appeals**

The Comptroller noted an appeal to the Court of Special Appeals on May 23, 2019. On October 21, 2019, the Court of Special Appeals stayed that appeal, pending the circuit court's final decision on Travelocity's petition for judicial review. On February 7, 2020, following the decision of the circuit court regarding Travelocity's cross-petition, Travelocity also noted its appeal to the Court of Special Appeals. On March 17, 2020, the Court of Special Appeals lifted the stay on the Comptroller's appeal and consolidated the two appeals. Prior to the consideration of the case by the Court of Special Appeals, Travelocity petitioned to this Court for *certiorari*. The Comptroller also filed a cross-petition, and we granted *certiorari* on both petitions. *Travelocity.com LP v. Comptroller of Maryland*, 469 Md. 659, 232 A.3d 259 (2020).

For the reasons expressed below, we conclude that Travelocity was not liable for the tax during the audit period and shall reverse.

## DISCUSSION

**Standard of Review**

"The Maryland Tax Court is an adjudicatory administrative agency" and, as we do when reviewing other administrative agencies, we "evaluate[] the decision of the agency[]" to determine whether, based on the "findings and reasons set forth by the Tax Court[,]" its determination can be upheld. *Gore Enter. Holdings, Inc. v. Comptroller of Treasury*, 437 Md. 492, 503–05, 87 A.3d 1263, 1269–70 (2014) (quotation marks and citations omitted). The factual determinations of the Tax Court are reviewed under the deferential substantial evidence test: "whether a reasoning mind reasonably could have reached the factual

7

conclusion the agency reached." *Id.* at 504, 87 A.3d at 1269 (quotation marks and citations omitted). A similar standard is employed to review "mixed question[s] of fact and law[.]" *Id.* at 504–05, 87 A.3d at 1269–70 ("The interpretation of the tax law can be a mixed question of fact and law, the resolution of which requires agency expertise. In reviewing mixed questions of law and fact, we apply the substantial evidence test, that is, the same standard of review we would apply to an agency factual finding.") (quotation marks and citations omitted).

"When the Tax Court interprets Maryland tax law, we accord that agency a degree of deference as the agency that administers and interprets those statutes." *Maryland State Comptroller of Treasury v. Wynne*, 431 Md. 147, 160, 64 A.3d 453, 460 (2013), *aff'd sub nom. Comptroller of Treasury of Maryland v. Wynne*, 575 U.S. 542, 135 S. Ct. 1787 (2015); *Gore Enter.*, 437 Md. at 505, 87 A.3d at 1270 ("The legal conclusions of an administrative agency that are premised upon an interpretation of the statutes that the agency administers are afforded great weight.") (quotation marks and citations omitted). That degree of deference, however, is not determinative; "a reviewing court is under no statutory constraints in reversing a Tax Court order which is premised solely upon an erroneous conclusion of law." *Ramsay, Scarlett & Co., Inc. v. Comptroller of Treasury*, 302 Md. 825, 834, 490 A.2d 1296, 1301 (1985) (citations omitted); *Lane v. Supervisor of Assessments of Montgomery Cty.*, 447 Md. 454, 464, 135 A.3d 828, 834 (2016) ("We affirm the decision of the Tax Court unless that decision is not supported by substantial evidence appearing in the record or is erroneous as a matter of law.") (quotation marks and citations omitted); *Comptroller of Treasury v. M. E. Rockhill, Inc.*, 205 Md. 226, 233, 107

A.2d 93, 97 (1954) ("We have recognized that the interpretation placed by the State Comptroller upon the Retail Sales Tax Act is entitled to great weight as an administrative interpretation acquiesced in by the [General Assembly]. We must emphasize, however, that such an interpretation is not binding upon the courts."). In the case at bar, the determination by the Tax Court of whether Travelocity was liable to pay the tax was premised on a conclusion of law. *See Kor-Ko Ltd. v. Maryland Dept. of the Environment*, 451 Md. 401, 412, 152 A.3d 841, 848 (2017) ("An agency decision based on regulatory and statutory interpretation is a conclusion of law."). Accordingly, we will review the decision of the Tax Court *de novo*. *Donlon v. Montgomery Cty. Pub. Sch.*, 460 Md. 62, 74, 188 A.3d 949, 956 (2018).

**Statutory Construction**

"In matters involving statutory construction, the canons applied by this Court are well-settled and have been oft repeated. The predominant goal of statutory construction is to ascertain and effectuate the intention of the legislature." *75-80 Properties, L.L.C. v. Rale, Inc.*, 470 Md. 598, 623, 236 A.3d 545, 559 (2020) (internal quotation marks and citation omitted). "[W]e begin by examining the plain meaning of the statutory language. If the language of the statute is unambiguous and clearly consistent with the statute's apparent purpose, our inquiry as to legislative intent ends ordinarily and we apply the statute as written, without resort to other rules of construction." *In re R.S.*, 470 Md. 380, 402, 235 A.3d 914, 927 (2020) (quotation marks and citations omitted). "If the statute's language is ambiguous, however, we will look towards other sources, such as relevant case law and legislative history, to aid us in determining the legislature's

intentions." *Couret-Rios v. Fire & Police Emps.' Ret. Sys. of City of Balt.*, 468 Md. 508, 528, 227 A.3d 637, 649 (2020). We have also recognized that:

> With regard to determining whether a statute is ambiguous, we have been clear; an ambiguity may still exist even when the words of the statute are themselves "crystal clear." That occurs when its application in a given situation is not clear. This is consistent with this Court's recognition that a term which is unambiguous in one context may be ambiguous in another. We have also acknowledged that language can be regarded as ambiguous in two different respects: 1) it may be intrinsically unclear; or 2) its intrinsic meaning may be fairly clear, but its application to a particular object or circumstance may be uncertain.

*Blind Indus. and Services of Maryland v. Maryland Dept. of General Services*, 371 Md. 221, 231–32, 808 A.2d 782, 788 (2002) (citations and markings omitted). "Whether the statutory language is clear or ambiguous, it is useful to review the legislative history of the statute[,]" *In re R.S.*, 470 Md. at 403, 235 A.3d at 927 (quotation marks and citations omitted), bearing in mind that any statutory interpretation must be reasonable and avoid "constructions that are illogical or nonsensical, or that render a statute meaningless." *Couret-Rios*, 468 Md. at 528, 227 A.3d at 649.

**Maryland's Sales and Use Tax Framework**

To address the issues prompting this appeal, we must construe the sales and use tax as it existed during the applicable audit period. The Maryland Tax Code imposed a sales and use tax on "a retail sale in the State; and a use, in the State, of tangible personal property or a taxable service." Tax Code § 11–102(a). The Tax Code, § 11-101, provided in pertinent part:

(i) *Sale.* — (1) "Sale" means a transaction for a consideration whereby:

10

(i) title or possession of property is transferred or is to be transferred absolutely or conditionally by any means, including by lease, rental, royalty agreement, or grant of a license for use; or

(ii) a person performs a service for another person.

(2) "Sale" does not include a transaction whereby an employee performs a service for the employee's employer.

\*\*\*

(k) *Tangible personal property.* — (1) "Tangible personal property" means:

(i) corporeal personal property of any nature; or

(ii) a right to occupy a room or lodgings as a transient guest.

\*\*\*

(l) *Taxable price.* — (1) "Taxable price" means the value, in money, of the consideration of any kind that is paid, delivered, payable, or deliverable by a buyer to a vendor in the consummation and complete performance of a sale without deduction for any expense or cost[.]

\*\*\*

(o) *Vendor.* — (1) "Vendor" means a person who:

(i) engages in the business of an out-of-state vendor, as defined in §11-701 of this title;

(ii) engages in the business of a retail vendor, as defined in §11-701 of the title; or

(iii) holds a special license . . .

(2) "Vendor" includes, for an out-of-state vendor, a salesman, representative, peddler, or canvasser whom the Comptroller, for the efficient administration of the title, elects to treat as an agent jointly responsible with the dealer, distributor, employer, or supervisor:

(i) under whom the agent operates; or

(ii) from whom the agent obtains the tangible personal property or taxable service for sale.

The Tax Code, § 11-701, in pertinent part, stated:

(b) *Engage in the business of an out-of-state vendor.* —

(1) "Engage in the business of an out-of-state-vendor" means to sell or deliver tangible personal property or a taxable service for use in the State.

(2) "Engage in the business of an out-of-state vendor" includes:

(i) permanently or temporarily maintaining, occupying, or using any office, sales or sample room, or distribution, storage, warehouse, or other place for the sale of tangible personal property or a taxable service directly or indirectly through an agent or subsidiary;

(ii) having an agent, canvasser, representative, salesman, or solicitor operating in the State for the purpose of delivering, selling, or taking orders for tangible personal property or a taxable service; or

(iii) entering the State on a regular basis to provide service or repair for tangible personal property.

(c) *Engage in the business of a retail vendor.* —

(1) "Engage in the business of a retail vendor" means to sell or deliver tangible personal property or a taxable service in the State.

(2) "Engage in the business of a retail vendor" includes liquidating a business that sells tangible personal property or a taxable service, when the liquidator holds out to the public that the business is conducted by the liquidator.

(d) *License.* —

(1) "License" means a license issued by the Comptroller:

(i) to engage in the business of an out-of-state vendor; or

12

(ii) to engage in the business of a retail vendor.

\*\*\*

**Statutory Analysis**

The sales and use tax imposed liability on "a retail sale in the State; and a use, in the State, of tangible personal property or a taxable service." Tax Code § 11–102(a). In order for Travelocity to be liable, its conduct must be considered (1) a sale or use (2) of tangible personal property under the Tax Code. The Tax Code defines tangible personal property as "corporeal personal property of any nature; or a right to occupy a room or lodgings as a transient guest." Tax Code § 11-101(k). Hotel room reservations and vehicle rentals would undoubtedly comport with the definition of tangible personal property in the Tax Code. By definition, a hotel room reservation is the "right to occupy a room or lodgings as a transient guest." Tax Code § 11-101(k). Likewise, a vehicle, as "movable machinery," is "corporeal personal property." *Comptroller of the Treasury, Retail Sales Tax Div. v. Steuart Inv. Co.*, 312 Md. 1, 6, 537 A.2d 607, 609 (1988) ("At common law, fixed and movable machinery are alike regarded as personal property."); *see also Corporeal*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Having a physical, material existence[.]"). As the hotel rooms and car rentals qualify as tangible personal property, we need to address whether the transactions constituted a sale or use under the Tax Code.

It is undisputed that the hotel rooms and rental vehicles were "delivered" to the customers, that is, the customers received the hotel rooms and rental cars. However, only "vendors" who "sold" or "delivered" tangible personal property were required to pay the sales and use tax. Tax Code §§ 11–101 (i), (k), (l), (o); 11-102. Accordingly, for

13

Travelocity to be liable for the tax, it must have "sold" or "delivered" the hotel rooms and rental cars as a "vendor" under the Tax Code.  The relevant list of vendors liable for the tax was limited to: (1) retail vendors, who sold or delivered tangible personal property or a taxable service in the State; and (2) out-of-state vendors, who sold or delivered tangible personal property or a taxable service *for use* in the State.[5]  Tax Code § 11-101 (o)(1); § 11-701 (b)–(d).  Here, we must interpret the Tax Code to determine whether Travelocity was a retail vendor or out-of-state vendor who "sold" or "delivered" the hotel and car rental reservations during the relevant audit period.  It was not, and is therefore not liable for the tax, as we shall explain below.

### Plain Language Analysis

A plain language analysis of the relevant provisions of the Tax Code indicates that Travelocity did not "sell" or "deliver" the reservations and was not a "vendor."

### Travelocity did not sell tangible personal property.

For Travelocity to sell the right to occupy the hotel rooms or rent a vehicle, and be liable for the tax, its business conduct would have to meet the definition of a "sale" delineated in Tax Code § 11–101(i):

(i) *Sale.* — (1) "Sale" means a transaction for a consideration whereby:

> (i) title or possession of property is transferred or is to be transferred absolutely or conditionally by any means, including by lease, rental, royalty agreement, or grant of a license for use[.]

---

[5] The third category—vendor with a special license—is not at issue here, and the Comptroller does not contend that Travelocity should be liable for acting as a vendor with a special license.

14

Thus, Travelocity's agreements with third-party companies must have the effect of transferring, for consideration, "title of possession of property," here, the right to occupy the hotel room or use the rental vehicle, in order to meet the definition of a "sale" under the Tax Code and be liable for the tax. In interpreting the terms of those contracts to ascertain whether they had the effect of transferring "title or possession of property" from third-party companies to Travelocity, this Court takes a harmonious look at the entirety of the contract. *Credible Behavioral Health, Inc. v. Johnson*, 466 Md. 380, 396, 220 A.3d 303, 312 (2019) ("We have previously indicated that, when interpreting contracts, we also attempt to construe contracts as a whole, to interpret their separate provisions harmoniously, so that, if possible, all of them may be given effect.") (quotation marks and citations omitted); *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 52, 73 A.3d 224, 232–33 (2013) ("[A] contract must be construed in its entirety and, if reasonably possible, effect must be given to each clause so that a court will not find an interpretation which casts out or disregards a meaningful part of the language of the writing unless no other course can be sensibly and reasonably followed.").

A review of a sample of contracts submitted as exhibits at the hearing reflects that Travelocity did not "sell" the rooms as a matter of law because they did not result in the transfer of title or possession of the hotel rooms or rental cars. For example, a 2004 agreement with a participating hotel stated in pertinent part:

> Sale of Rooms. Participating Hotel hereby grants Travelocity the right to make Rooms at Participating Hotel available for sale to users of the Travelocity Sites upon the terms and subject to the conditions set forth herein. *It is understood and agreed by the Parties that Travelocity has no obligation or right under this Agreement to acquire an inventory of Rooms*

and that Travelocity shall not bear any risk of loss with respect to the sale of Rooms.

(Emphasis added). A 2007 agreement with a participating Maryland hotel stated in pertinent part:

> Access to Rooms. Participating Hotel hereby *grants Travelocity* and its affiliate companies *the right to make Rooms at Participating Hotel available for booking* by Travelocity Customers upon the terms and subject to the conditions set forth herein. It is understood and agreed by the Parties that *nothing in this Agreement constitutes a sale or rental of Rooms* from Participating Hotel to Travelocity and that Travelocity bears no risk of loss with respect to any Rooms made available for sale hereunder.

(Emphasis added). The same language disclaiming Travelocity's investment in the sale or rental of rooms appeared in 2009 agreements as well as in 2010.

These contracts demonstrate that Travelocity did not acquire title or possession of the hotel rooms or rental cars. An agreement that sold an inventory of hotel rooms and transferred the risk of loss for those rooms would indicate a transfer of "title or possession." *See, e.g.*, *McFadden v. Mercantile-Safe Deposit & Tr. Co.*, 260 Md. 601, 618, 273 A.2d 198, 206 (1971) ("The principal test to determine whether goods are inventory is that they are held for immediate or ultimate sale."). However, the terms of the agreements make clear that Travelocity did not purchase or acquire inventory in the hotel rooms and rental vehicles, nor accept any risk of loss for the reservations. The agreements explicitly state: "nothing in this [a]greement constitutes a sale or rental of [r]ooms . . . to Travelocity[;]" "Travelocity has no obligation or right . . . to acquire an inventory of [r]ooms[;] and that Travelocity shall not bear any risk of loss." According to the plain terms of the agreements,

16

Travelocity did not purchase, acquire inventory, or accept a risk of loss and therefore, did not acquire "title or possession" of the hotel rooms or rental vehicles.

The purpose of the agreements further bolsters our analysis that Travelocity did not acquire title or possession of the hotel rooms or rental cars. The agreements explicitly grant Travelocity "the right to make [hotel r]ooms . . . available for booking." As stated in a 2007 agreement, "[t]his agreement sets forth certain terms and conditions *for the distribution of Enterprise travel products* and services through www.travelocity.com[.]" (Emphasis added). A 2009 agreement reiterated the same purpose:

> This Agreement sets forth certain terms and conditions *to broaden the distribution of Hertz's travel products and services through Travelocity*[.]
> ***
> 4.1. To *enhance its overall distribution efforts*, *Hertz shall make available to Travelocity, for distribution through Travelocity Web Sites*, all leisure and commercial vehicle rental rates and corresponding inventory of Hertz . . . that is generally available to all travel agencies. . . .

(Emphasis added).

As the purpose of the agreements was for Travelocity to facilitate hotel and car reservations for the benefit of the hotel and car rental agencies "to broaden the distribution of [the third-party agencies'] travel products and services through Travelocity," the relationship between Travelocity and the third-party agencies is best described as a joint business venture. Per the agreements, the hotels and car rental agencies remained owners and operators of their hotels and corporeal vehicles. Travelocity's role was to "broaden the distribution" of travel products via Travelocity's platform. The agencies provided Travelocity access to their reservation databases, and offered a lower rate, which Travelocity would publish on its online platform. Customers would then examine the hotel

17

and car rental information on Travelocity's website and purchase reservations at a lower rate. In this regard, Travelocity can be compared to a postal carrier who delivered, for a fee, items from a seller to a buyer while at the same time collecting payment from the buyer to return to the seller. The agency owners, via Travelocity's platform, transacted to sell the reservations to the customers. Travelocity facilitated those transactions by displaying the relevant information and conveying the customers' requested reservation to the agencies as well as the agencies' immediate response to the customer. Travelocity charged a fee for its facilitation services, which is analogous to the postage and additional collection on delivery fees of a mail carrier. At no time did Travelocity, as the "postal carrier" for the transactions between the agencies and the customers, obtain or transfer "title or possession" of the hotel rooms and rental vehicles to be liable for the sales and use tax.

In light of this analysis we find the Comptroller's arguments unavailing. The Comptroller argues that the use of the term "sale" in the contracts implies a sale of the right to occupy the rooms which would impose liability for the tax. The Comptroller also argues that Travelocity should be liable because it accepted customer payments and was listed as merchant of record on the transactions. However, as explained above, the entirety of the agreements makes clear that Travelocity did not obtain "title or possession" of the hotel rooms and rental cars, regardless of the use of the term "sale" in the agreements. Instead, it was a facilitator of reservations. In that regard, transacting with customers and accepting payments to then pass on to the agencies and being listed as merchant of record on the transactions fully comports with that role.

18

In sum, Travelocity facilitated the right to occupy a hotel room or rent a vehicle during the audit period, but did not acquire "title or possession" as required for a "sale" under the Tax Code § 11–101(i), and is therefore not liable for the tax.

**Travelocity was not an out-of-state or retail vendor during the audit period.**

To be liable for the sales and use tax as either an out-of-state or retail vendor, Travelocity must meet the definitions stated in § 11-701 of the Tax Code:

(b) *Engage in the business of an out-of-state vendor.* –

(1) "Engage in the business of an out-of-state-vendor" means to sell or deliver tangible personal property or a taxable service for use in the State.

(2) "Engage in the business of an out-of-state vendor" includes: . . .

(ii) having an agent, canvasser, representative, salesman, or solicitor operating in the State for the purpose of delivering, selling, or taking orders for tangible personal property of a taxable service; or

(c) *Engage in the business of a retail vendor.* –

(1) "Engage in the business of a retail vendor" means to sell or deliver tangible personal property or a taxable service in the State.

Tax Code § 11-701(b)(1) & (c)(1) both require a taxpayer "to sell or deliver tangible personal property." Additionally, Tax Code § 11-701(b)(2) imposes liability for having an in-state agent selling or delivering tangible personal property. As explained above, Travelocity did not acquire "title or possession" of the hotel rooms or rental cars, and its facilitation of hotel room and car rental reservations did not meet the Tax Code's definition of "sale."

19

Nor did Travelocity "deliver" the hotel rooms and rental cars for purposes of the tax. Undoubtedly, customers would receive hotel rooms and rental cars as a result of the reservations booked on Travelocity's online platform. However, as explained above, Travelocity did not own the hotel rooms and rental cars and could not, therefore, have the right to deliver the actual rooms and cars. A customer reviewing a reservation on Travelocity's website would select a reservation which Travelocity would then forward to the hotel and await confirmation in real time. The hotel would be the one to provide the reservation and Travelocity would furnish it to the customer on behalf of the hotel. Thus, Travelocity would not be liable for the sales and use tax as either a retail vendor pursuant to Tax Code § 11-701(c)(1) or an out-of-state vendor pursuant to Tax Code § 11-701(b)(1).

Unlike the contrary argument by the Comptroller, the third-party agencies were not the in-state agents of Travelocity which would impose liability under Tax Code § 11-701(b)(2). "An agent is a person who represents another in [] transactions[.]" *Globe Indem. Co. v. Victill Corp.*, 208 Md. 573, 581, 119 A.2d 423, 427 (1956); *Agent*, BLACK'S LAW DICTIONARY (11th ed. 2019) ("Someone who is authorized to act for or in place of another; a representative[.]"). As explained above, Travelocity and the third-party agencies agreed to certain terms for mutual benefit. The agencies provided the hotel rooms and rental cars for use, while Travelocity facilitated reservations through its website. At no time were the third-party agencies operating as agents of Travelocity to impose liability under Tax Code § 11–701(b)(2).

Finally, the Comptroller points to case law from other jurisdictions which held that online travel companies were considered vendors for tax purposes. *See, e.g.*, *Expedia, Inc.*

20

*v. D.C.*, 120 A.3d 623, 635 (D.C. 2015) (footnote omitted) ("[T]he meaning of the statute is clear: by imposing tax on the 'sale or charge . . . for any room . . . furnished to transients by any hotel,' the sales tax statute is taxing the sales transaction by which a customer purchases a hotel room in the District of Columbia. The [online travel companies'] retail margins are a part of that sale."); *Travelocity.com LP v. Wyoming Dep't of Revenue*, 2014 WY 43, ¶ 41, 329 P.3d 131, 143 (Wyo. 2014) (footnote omitted) ("The Department's position is supported by the specific language of the Wyoming sales tax statutes, persuasive case law from other state and federal courts, and the [online travel companies'] own description of their business before the sales tax litigation created incentives to characterize the transactions otherwise. We therefore conclude [the companies were] 'vendors' for purposes of the Wyoming sales tax while operating under the merchant or opaque models.").

These cases are not persuasive. In *Travelocity.com LP*, the Supreme Court of Wyoming faced a similar issue and concluded that online travel companies were considered vendors under the relevant Wyoming statutory scheme. 2014 WY at ¶ 36, 329 P.3d at 142. In its analysis, the Wyoming Supreme Court considered that "courts have held that [online travel companies] are not vendors or in the business of providing lodging services *under particular taxing statutes and ordinances*." *Id.* at ¶ 27, 329 P.3d at 140 (emphasis added); *Id.* at ¶ 30, 329 P.3d at 140–41 (listing cases of successful challenges by online travel companies to various tax statutes in different states). Reviewing the "particular taxing statutes" at issue, as we do here, has long been the analytical methodology employed by this Court when specifically addressing a prior version of the

21

sales tax statute. *See Rockhill*, 205 Md. at 229, 107 A. 2d at 95 (concluding that a corporation engaged in management of a summer resort was not liable for retail sales tax of long-term leases of summer cottages because such accommodations were not "regularly furnished to the public for consideration[]" as specifically defined by the relevant statute.); *Western Maryland Ry. Co. v. Comptroller of the Treasury*, Sales Tax No. 17, 1986 WL 9565, at *1 (Md. Tax Feb. 20, 1970) (concluding, based on *Rockhill*, that accommodations rented to the Western Maryland Railroad were not subject to the sales tax because it did not meet the relevant statutory definition of "transient guests[.]").

Turning to the sales and use statute as it existed during the audit period, as explained above, the definition of a vendor in the Maryland Tax Code did not include online travel companies. That statute differed from the statutes at issue in *Expedia* or *Travelocity*. *Compare* Md. Tax Code § 11-101(i) *with* D.C. Code § 47–2001(n)(1)(C). In *Expedia*, the tax at issue left "considerable ambiguity about which service exactly is subject to tax under the provision[.]" 120 A.3d at 632. In this case, there is no debate that the service provided by Travelocity concerned tangible personal property, i.e., "corporeal personal property of any nature; or a right to occupy a room or lodgings as a transient guest." Tax Code § 11-101(k). The only issue here is whether Travelocity was a vendor who sold or delivered that tangible personal property, which, as explained above, it was not. Accordingly, we are not persuaded by cases from other jurisdictions interpreting different tax codes, albeit with some similarity, in our interpretation of the Maryland Tax Code.

**Subsequent Legislative History**

In 2015, the General Assembly expanded the definition of a vendor liable for the sales and use tax to include an "accommodations intermediary"—a person who facilitates the sale or use of an accommodation for a fee—such as Travelocity.[6] 2016 Md. Laws ch. 3 (H.B. 1065 & S.B. 190 (2015)). For the reasons expressed below, we conclude that the legislative history supports our conclusion that Travelocity was not liable for the sales and use tax during the audit period.

The General Assembly amended the Tax Code § 11-101 via House Bill 1065 & Senate Bill 190 of the 2015 legislative session with the following stated purpose:

> FOR the purpose of clarifying the definition of "taxable price" for the State sales and use tax as it applies to the sale or use of an accommodation facilitated by an accommodations intermediary; *altering the definition of "vendor" under the State sales and use tax to include an accommodations intermediary*; defining certain terms; making a conforming change; and generally relating to clarifying the taxable price for an accommodation under the State sales and use tax.

2016 Md. Laws ch. 3 (H.B. 1065 & S.B. 190 (2015)) (emphasis added). The amendment to the statute expanded the scope of a "vendor" to include an "accommodations intermediary"—"a person, other than an accommodations provider, who facilitates the sale or use of an accommodation and charges a buyer the taxable price for the accommodation[]"—such as Travelocity. 2016 Md. Laws ch. 3 (H.B. 1065 & S.B. 190 (2015)). The Fiscal and Policy Note for Senate Bill 190 (2015) states that "[t]he bill also

---

[6] There is no dispute that Travelocity would be liable for the sales and use tax as a result of the amendment to the statute.

23

alters the definition of vendor under the State sales and use tax to include an accommodations intermediary."[7]

The subsequent addition of "accommodations intermediary" to the statute is an indication that prior to the amendment, an accommodations intermediary such as Travelocity was not included in the statutory definition of a vendor liable for the tax. As we noted in *State v. Coleman*, a "contrast between the amended Act and the superseded version demonstrates that the prior language did not mean what the new language does." 423 Md. 666, 683, 33 A.3d 468, 478 (2011).

The amendment was passed with the stated purpose of "altering the definition of 'vendor' under the State sales and use tax to include an accommodations intermediary[.]"

---

[7] We recognize, as the dissent points out, that the preamble of Senate Bill 190 (2015) states that

> [t]he clear intent of the State's existing sales and use tax law is to impose the tax on all consideration paid by transient guests in furtherance of the rental of sleeping accommodations; and [t]he purpose of this Act is to affirm that intent by clarifying the scope of certain terms used in the sales and use tax law, thereby facilitating the full and proper collection of the tax as originally intended[.]

However, the complete intention of the Bill, as indicated by the purpose and fiscal policy note, also includes "*altering the definition of vendor . . . to include an accommodations intermediary*" such as Travelocity. 2016 Md. Laws ch. 3 (H.B. 1065 & S.B. 190 (2015)) (emphasis added); S.B. 190 (2015) Fiscal and Policy Note at 1. *See also Blackstone v. Sharma*, 461 Md. 87, 122, 191 A.3d 1188, 1208 (2018) (citing the Fiscal and Policy Note for the Senate Bill as part of the legislative history analysis). Even according to the dissent, at the very least, this should not be considered one of the situations in which the legislative purpose is "overwhelmingly" clear, *see McAlear v. McAlear*, 298 Md. 320, 344, 469 A.2d 1256, 1268 (1984), and we would construe the ambiguity in favor of Travelocity as the taxpayer. *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.*, 389 Md. 156, 165, 884 A.2d 112, 117 (2005).

2016 Md. Laws ch. 3 (H.B. 1065 & S.B. 190 (2015)); S.B. 190 (2015) Fiscal and Policy Note at 1. If the amendment was merely clarifying that an accommodations intermediary was already included in the statutory definition of a vendor, then the additional term "accommodations intermediary" would be surplusage—an unfavorable result in statutory interpretation. *See, e.g.*, *Comptroller of Treasury v. Jameson*, 332 Md. 723, 734, 633 A.2d 93, 98 (1993) ("The [General Assembly] clearly intended this newly enacted phrase to alter the meaning of the statute; otherwise, such an amendment . . . would have been unnecessary. [I]f we were to interpret [the amended statute] as having the same meaning as it did when we [first] construed the statute . . . the new language added in the . . . amendment would be rendered mere surplusage.").

We have also held that while "a subsequent legislative amendment of a statute is not controlling as to the meaning of the prior law, nevertheless, subsequent legislation can be considered helpful to determine legislative intent." *Chesek v. Jones*, 406 Md. 446, 462, 959 A.2d 795, 804 (2008). Based on *Chesek*, the Comptroller argues that the subsequent legislation helps determine the legislative intent that an accommodations intermediary was always included in the statute, and the amendment simply clarified the original intent.

In our view, *Chesek* bolsters our analysis. The "subsequent legislation"—the 2015 amendment—is "helpful to determine the legislative intent[]"—that an accommodation intermediary was *not* included in the definition of vendor liable for the sales and use tax. *Chesek*, 406 Md. at 462, 959 A.2d at 804. As noted, one of the stated purposes of the 2015 amendment was to "alter[] the definition of 'vendor' under the State sales and use tax to include an accommodations intermediary." 2016 Md. Laws ch. 3 (H.B. 1065 & S.B. 190

25

(2015)).  The amendment clarified the intent of the General Assembly to expand the definition of a vendor liable for the sales and use tax to include an accommodations intermediary.  However, prior to the 2015 amendment, an accommodations intermediary was not included.

In sum, altering the definition of a vendor liable for the sales and use tax to include an accommodations intermediary such as Travelocity indicates that Travelocity was not part of the definition before the amendment.  Thus, the subsequent legislative history reflects that Travelocity was not liable for the sales and use tax during the audit period.

### Ambiguity

As we have emphasized, "when specifically interpreting tax statutes, this Court recognizes that any ambiguity within the statutory language must be interpreted in favor of the taxpayer." *Comptroller of the Treasury v. Citicorp Int'l Commc'ns, Inc.*, 389 Md. 156, 165, 884 A.2d 112, 117 (2005); *Rockhill*, 205 Md. at 234, 107 A.2d at 98 ("In interpreting a tax statute, the court must not extend its provisions by implication beyond the clear import of the language employed.  Such a statute, in case of doubt as to its scope, should be construed most strongly in favor of the citizen and against the State.").  Even the Tax Court acknowledged that the tax code was ambiguous as to whether Travelocity was liable for the sales and use tax.  In discussing the subsidiary issue of whether Travelocity would be subject to penalties and interest if found liable for the tax during the audit period, the Tax Court found that:

> *There is a good faith dispute as to whether the tax applies to Travelocity*, and the appeal was taken without any intent to avoid or delay the proper payment of any taxes which were owed to the government.  Although the law supports

26

the tax assessment by the Comptroller, reasonable cause exists to justify waiving penalties and interest and enforcing the four-year statute of limitations. Travelocity has demonstrated with affirmative evidence that reasonable cause exists that it was not grossly negligent i[n] not paying any sales and use tax as a newly defined vendor. *Moreover, the* [*General Assembly's*] *efforts to clarify and alter the definition of a vendor suggest that substantial uncertainty exists as to the applicability of the law to Travelocity* and similar [online travel companies].

*Travelocity.com LP v. Comptroller of Maryland*, No. 12-SU-OO-1184, 2017 WL 11295796, at \*4 (Md. Tax Dec. 18, 2017) (emphasis added). The fact that the General Assembly clarified and amended the statute to include an accommodations intermediary such as Travelocity, indicates that the statute was at least ambiguous as to whether Travelocity was included beforehand. In this case, we interpret any potential ambiguity in favor of Travelocity and conclude that Travelocity was not liable for the sales and use tax during the audit period.

## CONCLUSION

Travel industry practices have long informed the developments of the State's tax legislation, and the instant case serves as another example.[8] In *Rockhill*, for example, this

---

[8] Neither the General Assembly nor the sales tax at issue are alone in this predicament. *See, e.g.*, *Minh-Vu Hoang v. Lowery*, 469 Md. 95, 129, 228 A.3d 1148, 1168 (2020), *reconsideration denied* (July 13, 2020) (McDonald, J., dissenting) (noting, in a bankruptcy case, that "a legislature is always playing catch-up"); *In re C.K.G.*, 173 S.W.3d 714, 733–34 (Tenn. 2005) (Birch, J., dissenting) ("At the outset, I am convicted that any resolution reached in this case will be temporary only—a stop-gap solution usable for this case alone, pending legislative action, as the law accelerates to catch up with the rapidly evolving technology of reproduction and its consequences."); *T.V. v. New York State Dep't of Health*, 88 A.D.3d 290, 296, 929 N.Y.S.2d 139, 143 (2011) ("Through the years, the law has tried to keep pace with medical developments in the field of assisted reproduction. Despite this, the law has not yet caught up with science."); *Johnson v. Burmaster*, 307 Wis. 2d 213, 230, 744 N.W.2d 900, 908 (2007) ("Perhaps the legislation simply has not caught up with the times and technology.").

27

Court held that long-term leases of summer cottages were not "regularly furnished to the public for consideration[]" as defined by statute. 205 Md. at 229, 107 A.2d at 95. Similarly, in *Western Maryland Ry. Co.*, the Tax Court concluded that Railroad employees were not "transient guests" as defined by statute. 1986 WL 9565, at *1.

In the case at bar, Travelocity's business and technological acumen preceded the State's tax legislation, until the General Assembly 'caught up' with the 2015 amendment. Therefore, as explained above, the Tax Court erroneously concluded that Travelocity was liable for the sales and use tax during the audit period. Thus, the circuit court erred in affirming the decision of the Tax Court.

**JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

IN THE COURT OF APPEALS

OF MARYLAND

No. 14

September Term, 2020

_____

TRAVELOCITY.COM LP N/K/A TVL LP

v.

COMPTROLLER OF MARYLAND

_____

Barbera, C.J.
McDonald
Watts
Hotten
Getty
Booth
Biran,

JJ.

_____

Dissenting Opinion by Watts, J., which
Barbera, C.J., and McDonald, J., join.

_____

Filed: April 30, 2021

Respectfully, I dissent. In my view, Travelocity.com LP n/k/a TVL LP ("Travelocity"), Petitioner/Cross-Respondent, was required to pay the sales and use tax on the fees that it charged its customers. I would affirm the judgment of the Circuit Court for Anne Arundel County, which affirmed the decision of the Maryland Tax Court. I would hold that the Maryland Tax Court was correct in concluding that Travelocity was a "vendor" under Md. Code Ann., Tax-Gen. (1988, 1997 Repl. Vol., 2002 Supp.) ("TG (2002)") § 11-101(o)(1)(i), and that the sales and use tax applied to the fees Travelocity charged its customers. See Travelocity.com LP v. Comptroller of Maryland, No. 12-SU-OO-1184, 2017 WL 11295796, at *3 (Md. Tax Ct. Dec. 18, 2017).[1]

The Maryland Tax Court's findings of fact establish that, when a customer used Travelocity's website to reserve a hotel room or rental car, Travelocity acted as a vendor and made a sale to the customer. The Maryland Tax Court found that, when a customer tried to reserve a hotel room on Travelocity's website, Travelocity immediately forwarded the customer's request to the hotel and waited for the hotel to accept or deny it. See Travelocity.com, 2017 WL 11295796, at *1. If the hotel accepted the customer's request, the hotel informed Travelocity of the confirmation number, and Travelocity provided the

---

[1]As to the remaining issues in the case, I would hold that the Maryland Tax Court was correct in concluding that the "taxable price" under TG (2002) § 11-101(j)(1) did not encompass the "tax recovery charge"—*i.e.*, a hotel's estimate of the State and local taxes that would apply to the sale of a hotel room, and for which the hotel billed Travelocity after a customer used Travelocity's website to reserve the hotel room. See Travelocity.com, 2017 WL 11295796, at *3, *1. I would also conclude that there is substantial evidence to support the Maryland Tax Court's finding that Travelocity was not grossly negligent, and that, accordingly, the four-year limitations period under TG (2002) § 13-1102(a) applied. See id. at *4.

customer with that number.  See id.  When a customer reserved a hotel room or rental car on Travelocity's website, Travelocity charged the customer's credit card.  See id.  The customer could use the hotel room or rental car without entering into a contract with, and/or directly paying, the hotel or rental car company.  See id.  The hotel or rental car company would simply bill Travelocity afterward for the price of the hotel room or rental car.  See id.

Under these circumstances, when a customer used Travelocity's website to reserve a hotel room or rental car, Travelocity engaged in a sale—*i.e.*, Travelocity engaged in a "transaction for consideration" and "transferred" to the customer a "grant of a license for use" or "possession of" the hotel room or rental car.  TG (2002) § 11-101(f)(1)(i).  Indeed, when a customer used Travelocity's website to reserve a hotel room or rental car, the role of the hotel or rental car company was entirely passive.  The hotel or rental car company did nothing with respect to the customer—much less engage in a transaction with the customer.  Until the customer arrived to use the hotel room or rental car, the hotel or rental car company had no contact whatsoever with the customer.  Equally important, the hotel or rental car company did not receive any consideration until after it billed Travelocity for the cost of the hotel room or rental car, and Travelocity paid the bill.  The circumstance that Travelocity did not immediately transfer possession of the hotel room or rental car to the customer does not change the fact that Travelocity immediately accepted consideration from the customer, and immediately transferred to the customer the grant of a license to use a hotel room or rental car.  These actions were "sales" under the plain language of TG (2002) § 11-101(f)(1)(i) and caused Travelocity to fall under the definition of a vendor as

described in TG (2002) § 11-101(o)(1).[2]

Although the plain language of both TG (2002) § 11-101(f)(1)(i) and § 11-101(o)(1) resolves the matter, the legislative history of the statute confirms the conclusion. See, e.g., Brutus 630, LLC v. Town of Bel Air, 448 Md. 355, 367-68, 139 A.3d 957, 964 (2016). In 2016, the General Assembly added the term "accommodations intermediary" to the definition of "vendor" in Md. Code Ann., Tax-Gen. (1988, 2010 Repl. Vol., 2014 Supp.) ("TG (2014)") § 11-101(o)(1). The term "accommodations intermediary" is defined as "a person, other than an accommodations provider, who facilitates the sale or use of an accommodation and charges a buyer the taxable price for the accommodation." 2016 Md. Laws 162-63 (Vol. I, Ch. 3, S.B. 150) (capitalization omitted).[3] The obvious purpose of

---

[2]TG (2002) § 11-101(o)(1)(ii) defined "vendor" as follows: "'Vendor' means a person who . . . engages in the business of a retail vendor, as defined in § 11-701 of this title[.]" In turn, TG (2002) § 11-701(c)(1) defined "engage in the business of a retail vendor" as follows: "'Engage in the business of a retail vendor' means to sell or deliver tangible personal property or a taxable service in the State." 1988 Md. Laws 456 (some capitalization omitted).

[3]Senate Bill 190 (2015) amended TG (2014) § 11-101(o)(1)'s definition of "vendor" as follows: "'Vendor' means a person who . . . (IV) IS AN ACCOMMODATIONS INTERMEDIARY." 2015 Md. Laws 2909, 2911-12. Senate Bill 190 (2015) amended TG (2014) § 11-101(k)(1)(ii)'s definition of "tangible personal property" as follows: "'Tangible personal property' means . . . a right to occupy a room or lodgings as a transient guest AN ACCOMMODATION." Id. at 2911. Finally, Senate Bill 190 (2015) added to TG (2014) § 11-101 the following definitions of "accommodation," "accommodations intermediary," and "accommodations provider":

> (A-1) "ACCOMMODATION" MEANS A RIGHT TO OCCUPY A ROOM OR LODGINGS AS A TRANSIENT GUEST.
>
> (A-2) (1) "ACCOMMODATIONS INTERMEDIARY" MEANS A PERSON, OTHER THAN AN ACCOMMODATIONS PROVIDER, WHO FACILITATES THE SALE OR USE OF AN ACCOMMODATION AND

- 3 -

the 2016 amendment of the definition of "vendor" in TG (2014) § 11-101(o)(1) was to eliminate any doubt that online travel companies were "vendors" under TG (2014) § 11-101(o)(1). Although the 2016 amendment of the definition of "vendor" in TG (2014) § 11-101(o)(1) became effective after the period that the Comptroller's audit of Travelocity covered, the amendment supports the determination that Travelocity was a "vendor" under TG (2002) § 11-101(o)(1)(i) during the period of time in question.[4]

From my perspective, Travelocity's contention that the 2016 amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1) proves that the definition was ambiguous, and that concluding otherwise would render superfluous the 2016 amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1) is not persuasive. Nothing in

---

> CHARGES A BUYER THE TAXABLE PRICE FOR THE ACCOMMODATION.
>
> (2) FOR PURPOSES OF THIS SUBSECTION, A PERSON SHALL BE CONSIDERED TO FACILITATE THE SALE OR USE OF AN ACCOMMODATION IF THE PERSON BROKERS, COORDINATES, OR IN ANY OTHER WAY ARRANGES FOR THE SALE OR USE OF AN ACCOMMODATION BY A BUYER.
>
> (A-3) "ACCOMMODATIONS PROVIDER" MEANS A PERSON THAT OWNS, OPERATES, OR MANAGES AN ACCOMMODATION AND MAKES THE ACCOMMODATION AVAILABLE FOR SALE OR USE TO A BUYER.

Id. at 2910-11. On February 20, 2016, the amendments to TG (2014) § 11-101 became effective.

[4]The Comptroller initiated an audit of Travelocity's Maryland sales and use tax returns for the eight-year period from March 1, 2003 through April 30, 2011. During that period, TG (2002) § 11-403(a)(1) required a vendor to collect the sales and use tax, stating: "Except as otherwise provided in this subtitle, a vendor shall collect the applicable sales and use tax from the buyer[] at the time that the sale is made, regardless of when the taxable price is paid[.]"

the legislative history of the 2016 amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1) indicates that the General Assembly believed that the definition was ambiguous or confusing. Among other things, the stated purpose of Senate Bill 190 (2015)—through which the General Assembly made multiple amendments to TG (2014) § 11-101—was to alter "the definition of 'vendor' under the State sales and use tax to include an accommodations intermediary[.]" Likewise, the Fiscal and Policy Note of Senate Bill 190 (2015) contained similar language advising of the amendment of the definition of "vendor." S.B. 190 (2015) Fiscal and Policy Note, <u>available at</u> https://mgaleg.maryland.gov/2015RS/fnotes/bil_0000/sb0190.pdf. With this language, the General Assembly merely advised that the definition of the word "vendor" would be amended to include an accommodation intermediary. The preamble of Senate Bill 190 (2015), however, stated:

> WHEREAS, The clear intent of the State's existing sales and use tax law is to impose the tax on all consideration paid by transient guests in furtherance of the rental of sleeping accommodations; and
> WHEREAS, The purpose of this Act is to affirm that intent by clarifying the scope of certain terms used in the sales and use tax law, thereby facilitating the full and proper collection of the tax as originally intended[.]

What can be gleaned from the legislative history is that the General Assembly believed that it was obvious that online travel companies were "vendors" under TG (2014) § 11-101(o)(1) and that the matter did not merit any additional comment beyond advising of the amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1). In other words, it is evident that the General Assembly was of the view that the definition of "vendor" in TG (2014) § 11-101(o)(1) was unambiguous, and that the 2016 amendment to the definition

- 5 -

was a prophylactic measure that confirmed, out of an abundance of caution, what was already the intent under existing law. The circumstance that the 2016 amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1) updated the definition of the word "vendor" does not mean that the amendment was superfluous.[5]

The legislative history of the 2016 amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1) indicates that the General Assembly recognized that making such a revision was warranted. The Fiscal and Policy Note of Senate Bill 190 (2015) stated that multiple legal disputes had arisen regarding the amount of sales and use tax that online travel companies owed government entities. See S.B. 190 (2015) Fiscal and Policy Note at 2. This case was the only case to which the Fiscal and Policy Note of Senate Bill 190 (2015) referred by name. See id. As to the fiscal effect, the Fiscal and Policy Note stated:

> The bill is intended to clarify current law with regards to the taxable price of hotel room rentals. As such, it would be expected that the amount of sales

---

[5]I am aware that, in its opinion, the Maryland Tax Court stated:

The modified definition of "taxable price" "includes, for the sale or use of an accommodation facilitated by an accommodations intermediary, the full amount of the consideration paid by a buyer for the sale or use of an accommodation, but not including any tax that is remitted to a taxing authority." The legislature claims that the purpose of the amendments to the definition of "taxable price" was for clarification in that some ambiguity existed in the statute prior to amendment. The inclusion of newly defined terms of a vendor in the statute is in fact more substantive than a mere clarification.

Travelocity.com, 2017 WL 11295796, at *3. With this statement, the Maryland Tax Court recognized the legislative intent of the 2016 amendment was to clarify the term "vendor" and to eliminate some ambiguity—undoubtedly, the ambiguity caused by Travelocity's claim. The circumstance that the Maryland Tax Court referred to the modified definition of the word "vendor" as more substantive than stated by the General Assembly does not change the legislative intent, which the Maryland Tax Court clearly recognized.

tax revenues collected would be unchanged. However, because [online travel companies] are not currently paying sales tax using the State's interpretation of taxable price, the bill would result in a revenue increase.

The clarification of the meaning of taxable price would obviously only apply to vendors who are responsible for paying the sales and use tax. To the extent that the Fiscal and Policy Note stated that online travel companies were not using the State's interpretation of taxable price and referenced this case, it is reasonable to infer that the General Assembly knew that, in this case, Travelocity had contended that it was not a "vendor" under TG (2002) § 11-101(o)(1)(i) and that the sales and use tax did not apply to the fees that it charged its customers. It is evident that the 2016 amendment to the definition of "vendor" in TG (2014) § 11-101(o)(1) was the General Assembly's method of expressing its disagreement with Travelocity's position in this case.

In doing so, the General Assembly in no way indicated that it believed that the definition of "vendor" in TG (2014) § 11-101(o)(1) was ambiguous. To the contrary, it appears that the General Assembly simply responded to a legal question that Travelocity had raised—namely, whether it was a "vendor" under TG (2002) § 11-101(o)(1)(i). In other words, the General Assembly was essentially closing a door that Travelocity had attempted to open. Travelocity should not be given the benefit of so-called "ambiguity" in the definition of the word "vendor" in TG (2002) § 11-101(o)(1)(i) where Travelocity itself manufactured the alleged ambiguity by failing to pay the sales and use tax and starting a legal dispute about the word.

I differ with the reasoning that Travelocity did not sell hotel rooms or rental cars because Travelocity did not have title to or possession of hotel rooms or rental cars. See

Maj. Slip Op. at 18-19. Travelocity's argument that it was not a "vendor" under TG (2002) § 11-101(o)(1)(i) because it did not own any hotel rooms or rental cars, did not have any blocks of hotel rooms reserved, and was not guaranteed to have available hotel rooms or rental cars from any particular hotel or rental car company is a red herring. These circumstances are of no moment because Travelocity was not selling title to a hotel room or rental car—*i.e.*, Travelocity never sold a customer a piece of real estate, or ownership of a vehicle. Instead, Travelocity was selling the right to use a hotel room or rental car or selling a "grant of a license for use" or "possession of" the hotel room or rental car. TG (2002) § 11-101(f)(1)(i). It was the grant of a license to use the hotel room or rental car, or the right to temporarily use the hotel room or rental car, that was the subject of Travelocity's sales to its customers. That right is exactly what Travelocity's customers wanted and bought, and what Travelocity provided and sold. Although Travelocity's customers did not immediately receive possession of a hotel room or rental car when making a reservation on Travelocity's website, what matters is that they immediately received the right to possess a hotel room or rental car.

The comparison of Travelocity "to a postal carrier who delivered, for a fee, items from a seller to a buyer" is not applicable. Maj. Slip Op. at 18. First, postal carriers do not sell the right to use products on behalf of a seller. Moreover, where a person (the seller in the analogy) mails an item to a recipient (the buyer), the postal service charges the person who mails the item, *i.e.*, the purported seller, not the buyer, for the cost of the service. By contrast, when Travelocity sold hotel rooms and rental cars on behalf of hotels and rental car companies, Travelocity, like any other seller, charged the buyer. In other words, unlike

- 8 -

the postal service, Travelocity, like any other vendor, directly charged buyers for its products or services.

Similarly, Travelocity's reliance on the circumstance that, when a customer used Travelocity's website to reserve a hotel room or rental car, the customer was required to agree to the hotel's or rental car company's terms and conditions before taking possession of the room or car is of no moment. Under the plain language of TG (2002) § 11-101(f)(1)(i), "'[s]ale' means a transaction for a consideration whereby[] title or possession of property is transferred or is to be transferred absolutely or conditionally[.]" Obviously, Travelocity did not sell a customer an absolute, unconditional right to use a hotel room or rental car. Instead, Travelocity sold the customer the right to use the hotel room or rental car, conditioned on the customer's acceptance of, and adherence to, the hotel's or rental car company's terms and conditions. The plain language of the statute allowed Travelocity to make such a conditional sale. The applicability of the hotel's or rental car company's terms and conditions did not negate the circumstance that Travelocity engaged in the sale of the right to use a hotel room or rental car.

Notwithstanding Travelocity's contention otherwise, there was substantial evidence to support the findings of fact by the Maryland Tax Court that underlay its conclusion that Travelocity was a "vendor" under TG (2002) § 11-101(o)(1)(i). Travelocity argues that there was not substantial evidence to support the Maryland Tax Court's finding that the contracts between it and hotels gave Travelocity the right to sell hotel rooms, and that Travelocity's customers could use hotel rooms or rental cars without entering into contracts with, and/or directly paying, the hotels or rental car companies. Although Travelocity

refers to the "substantial evidence" standard in making these assertions, in actuality, these arguments boil down to Travelocity taking issue with the inferences that the Maryland Tax Court drew from the contracts and other documentary evidence. For instance, Travelocity argues that the Maryland Tax Court erroneously focused on the stray or isolated use of the word "sell" in contracts between Travelocity and hotels and failed to construe the contracts as a whole. It was within the purview of the Maryland Tax Court, as the administrative agency making findings of fact in this case, to draw the inferences that it did from the documentary evidence. Although Travelocity may wish that the Maryland Tax Court had drawn inferences that were more favorable to it, this does not establish that there was a lack of substantial evidence to support the Maryland Tax Court's findings.

Travelocity's reliance on Comptroller of Treasury v. M. E. Rockhill, Inc., 205 Md. 226, 107 A.2d 93 (1954) and Western Maryland Railway Company v. Comptroller of the Treasury, Sales Tax No. 17, 1986 WL 9565 (Md. Tax Feb. 20, 1970) for the contention that the sales and use tax did not apply to the fees that Travelocity charged its customers because hotel owners and operators are the only entities that must pay the sales and use tax on sales of hotel rooms is unwarranted. Both of the cases on which Travelocity relies are at least five decades old, and both of them involved definitions of the term "sale at retail" that are no longer in effect. See Rockhill, 205 Md. at 228-29, 107 A.2d at 95; Western Maryland Railway, 1986 WL 9565, at *1. For example, Rockhill, 205 Md. at 228-29, 107 A.2d at 95, involved a definition of "sale at retail" that included, in pertinent part, "[t]he sale or charges for any room or rooms, lodgings, or accommodations furnished by any hotel[.]" By contrast, here, the applicable provision is the definition of "sale" in TG (2002)

§ 11-101(f)(1)(i), which is not limited to sales of hotel rooms by hotels themselves. As explained, Travelocity's transactions with its customers were "sales" under TG (2002) § 11-101(f)(1)(i). To whatever extent Rockhill and Western Maryland Railway once stood for the proposition that hotel owners and operators alone were required to pay the sales and use tax on sales of hotel rooms, the amendments to the relevant statutes in the intervening decades have rendered Rockhill and Western Maryland Railway no longer persuasive authority. Because no online travel companies existed back when Rockhill and Western Maryland Railway were decided, these cases offer no guidance in determining whether Travelocity was a "vendor" under TG (2002) § 11-101(o)(1)(i).

Put simply, for the myriad of reasons discussed herein, the Maryland Tax Court was correct in concluding that Travelocity was a "vendor" under TG (2002) § 11-101(o)(1)(i), and that the sales and use tax applied to the fees that Travelocity charged its customers. See Travelocity.com LP, 2017 WL 11295796, at *3.

For the above reasons, respectfully, I dissent.

Chief Judge Barbera and Judge McDonald have authorized me to state that they join in this opinion.